# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA        . CRIMINAL NO.15-10046-LTS
                                .
         V.                     . BOSTON, MASSACHUSETTS
                                . JUNE 12, 2015
                                .
MARTIN LUSTGARTEN ACHERMAN      .
      Defendant                 .
. . . . . . . . . . . . . . . .
```

### TRANSCRIPT OF DETENTION HEARING
#### BEFORE THE HONORABLE JUDITH G. DEIN
#### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE
Katherine H. Ferguson, Esq.
John Joseph Moakley U.S. Federal Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3555
katherine.ferguson@usdoj.gov

UNITED STATES DEPARTMENT OF JUSTICE
Joseph Palazzo, Esq.
1400 New York Ave., NW - 10th Floor
Washington, DC 20005
(202) 445-7910
joseph.palazzo@usdoj.gov

NATHAN P. DIAMOND, P.A.
Nathan P. Diamond, Esq.
888 Biscayne Boulevard, Suite 501
Miami, FL 33132
305-371-5300
attydiamon@aol.com

Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA 02093**
**(508) 384-2003**

1  (Case called into session)

2  (10:11:46 AM)

3         THE CLERK:  United States District Court for the

4  District of Massachusetts is now in session on June 12,

5  the year 2015 in the matter of the United States of

6  America v. Martin Lustgarten Acherman, Criminal Case No.

7  2015-10046.

8         Could counsel please identify themselves for the

9  record?

10         MR. PALAZZO:  Good morning, Your Honor, my name

11  is Joseph Palazzo.  I'm with the Criminal Division in

12  Washington DC and I'm here today with Kate Ferguson, an

13  AUSA in the U.S. Attorney's Office here.

14         THE COURT:  Thank you.

15         MS. FERGUSON:  Good morning.

16         MR. MULLANE:  Good morning.  For the defendant

17  with Nathan Diamond.

18         MR. DIAMOND:  If it please the Court, Nathan

19  Diamond on behalf of Martin Lustgarten Acherman who stands

20  beside me.  Good morning.

21         THE COURT:  Good morning.  All right, so we're

22  scheduled here to address the issue of pretrial detention.

23  How do you want to proceed?

24         MR. PALAZZO:  The government opposes the motion

25  for pretrial release.

1    THE COURT:  All right.  Do you want to proceed

2  with a witness or do you want to proceed by proffer?  What

3  are we doing?

4    MR. PALAZZO:  We had an agreement that if we

5  picked today's date for the hearing that we wouldn't have

6  a witness available.

7    THE COURT:  You would?

8    MR. PALAZZO:  Would not.

9    THE COURT:  Would not, okay, so we're going by

10  proffer?

11    MR. DIAMOND:  Yes.

12    MR. PALAZZO:  Yes, Your Honor.

13    THE COURT:  All right so let me hear from the

14  government first.

15    MR. PALAZZO:  Thank you, Your Honor.  I'd stand

16  here today in opposition after careful consideration and

17  reconsideration of the case against Mr. Lustgarten and his

18  proposition of bond, and there are simply no conditions or

19  series of conditions that will reasonably assure his

20  appearance before this Court.  There are four main

21  reasons, not the least of which is the seriousness of the

22  crimes and the length of the sentence that Mr. Lustgarten

23  faces.  Normally, the guidelines ask - based on the amount

24  of money that he stands accused of laundering; it would be

25  a life sentence.  The statutory maximum is 20 years,

1   however, and there is no doubt that a man of his

2   financial resources, there is simply no amount of money he

3   would not be able to pay in order to get out of this and

4   abscond from the country and that brings me to my second

5   point.  He is really a man of the world.  He holds two

6   passports.  He is a citiz, that we know of.  He is a

7   citizen of Austria.  He is a citizen of Venezuela.  He has

8   a residence in Panama and I have a proposed exhibit here

9   No. 1 that begins to explain some of the financial

10  resources that he has scattered around the world.  This is

11  definitely not a complete financial picture but we were

12  able to find bank accounts in Hong Kong, Switzerland,

13  Panama, Singapore.  We also have evidence that will show

14  at trial that he has accounts in Austria, that he has

15  accounts in Columbia.  So this is a man of tremendous

16  resources.  If I, if I may, Your Honor--

17          THE COURT:  What was the bankruptcy in Florida?

18  If I have the pretrial services report it says that he

19  filed for bankruptcy in 2000?

20          MR. PALAZZO:  It's my understanding that he was

21  the subject of a civil lawsuit that forced him into a

22  bankruptcy 10 years ago.  Since then you'll see on the

23  exhibit, we have evidence we're prepared to show at trial

24  over half a billion dollars passed through accounts that

25  he controlled in merely a four year period since that

1 bankruptcy, and so we think this is clear and convincing

2 evidence that he is a flight risk.  A $1.3 million surety

3 that he's offering today is not even on a good day what he

4 makes in a few hours, Your Honor.

5          THE COURT:  Can I see the exhibit?  So would you

6 just explain to me this defendant's relationship to these

7 companies that are the account holders?

8          MR. PALAZZO:  He is the owner and the

9 beneficiary of these companies.  They are essentially

10 shells based overseas that he uses as vehicles to move

11 money around the world.  His name is associated with some

12 of them on legal documents and on others he's not, but the

13 government's case which has taken, there's an

14 investigation over several years includes Title III

15 intercepts, includes extensive wire taps.  It includes

16 interviews with numerous witnesses and clients of Mr.

17 Lustgarten and at trial we're fully prepared to bring them

18 in to show that the significant portion of these funds

19 come from drug cartels in South America.

20          THE COURT:  Can you just give me an overview of

21 the facts--

22          MR. PALAZZO:  Yes.

23          THE COURT:  --that you expect to be able to

24 prove?

25          MR. PALAZZO:  Yes, Your Honor.  The facts are

1   that drug traffickers approach Mr. Lustgarten with

2   requests to get money in and out of Venezuela.  The facts

3   are that that is Mr. Lustgarten's profession.  If you need

4   to get money, whatever the currency or whether it be

5   Venezuelan Bolivars or U.S. dollars, Mr. Lustgarten is the

6   man to see now that he lives in Panama.  So his clients

7   include some legitimate businesses who are importers that

8   need to get, you know, electronics into Venezuela which

9   has very tight currency controls but the way he's able to

10  do that is he has an influx of U.S. dollars that are given

11  to him by illegitimate people including drug cartels,

12  including a revolutionary right wing paramilitary group,

13  including people who are stealing from the Venezuelan

14  government, including people who in this country would

15  stand accused of serious corruption.  So if you have, or

16  simply if you don't want to pay taxes in Venezuela or

17  otherwise and you need to hide your money, you come to see

18  Mr. Lustgarten.  Which brings me to a second exhibit if I

19  may, Your Honor, comes from one of the many Title III

20  intercepts, we'll be introducing at trial and the

21  background.  This is an email sent or between Mr.

22  Lustgarten and essentially a corrupt Swiss banker who he

23  is friends with and at this point is an unindicted co-

24  conspirator.  His name is Charles DuMont or Ded DuMont

25  (ph), and part of the scheme that Mr. Lustgarten stands

accused of is that he had a relationship with a DEA Agent

here in Boston where Mr. Lustgarten for a very short

period of time provided information about on goings in

Venezuela and the money laundering world.  That

relationship broke down because of lies that Mr.

Lustgarten said and did regarding his relationship with

the agent, but part of his scheme in laundering money is

that he goes around town essentially with some kind of

piece of paper, some kind of document either from this

office or from DEA which he purports to be some sort of

license to launder funds and essentially he brags to

clients, hey, I'm in with DEA.  I can do whatever I want.

I can move this money.  I'm protected.  And this

essentially is false and it's part of the reason he's

charged with obstruction today as well.  But at some point

in April of 2014, I think his bragging catches up with

certain members of his clientele who are not happy to

learn that he has any kind of dealings with the DEA.  So

it's sort of backfiring on the business and he is talking

to this Swiss banker about it and, you know, it's eight

pages, Your Honor, and I'm on page 5.  I don't know if

it's easier if I give you the exhibit now, you follow

along as I read it the record.  And Mr. Lustgarten's

initials there, MLA, are abbreviations for his statements.

He says to the Swiss banker after the banker is

complaining about his relationship, I keep everybody's,

"I keep saving everybody's expletive.  When they thought I

was radioactive I was hiding their profits from the IRS

and I established their structures.  They thought a couple

of millions were more important.  Soon after they realized

that the "informant" was their protector and the expletive

who saved them the money that was seized in the *Rosemont*

case by striking a deal with the U.S. government."  Later

on in the same context Mr. Lustgarten goes on to say, "not

much people can do what I do and how I do it and I enjoy a

very high level of protection because I have delivered

already a couple of drug dealers and a guy who wanted to

skip trading with Iran, but drug dealers because I had no

choice and the Iran guy just for fun".  Later on, Mr.

Lustgarten again, "sometimes you're in between a rock and

a hard place.  When I got into a relationship with them,

they had seized all of our money and would only release it

in exchange for information on a client of Soto who was

money laundering through our accounts".  Shortly

thereafter, "Every three months they meet with me and give

me a list of the people who they deemed of interest.  I

just have to be alert.  Last meeting they asked me about

Soto and why we parted.  I told them I was not in

agreement on how he handles things.  They asked about the

Obertos and I kept quiet and I told you, now I don't know

1   what they are going to ask.  They keep going back to

2   Maffi (the money launderer)."

3          Your Honor, any type of trial, the government is

4   fully prepared to call witnesses, call members of various

5   drug cartels to this Court and they are willing to testify

6   that this Mr. Maffi or Mrs. Maffi, Mr. Maffi, that the

7   defendant is talking about here is not only a money

8   launderer, he is a convicted drug trafficker.  Mr. Soto

9   that he speaks of is a former partner, or it's unclear if

10  he's a current partner or a former partner, but he is a

11  fellow money launderer that at this hour is an unindicted

12  coconspirator.

13         Those are some of the facts, Your Honor.  You

14  know, we don't wish to try the case today, but the

15  government would like the Court also to take into

16  consideration the fact that he has a track record of

17  lying, whether it's to the government, whether it's to his

18  potential clients, his bankers and we have, you know,

19  thousands of bank documents.  We have emails.  We have

20  phone calls and we're going to bring forth all of this at

21  trial in light of the fact that he has hundreds of

22  millions of, access to hundreds of millions of dollars,

23  his knowledge of the banking world, he essentially is the

24  poster child for risk of flight and for all these reasons

25  we ask you to deny his motion and to keep him in custody

1  before trial.

2          THE COURT:  Thank you.  Counsel.

3          MR. DIAMOND:  May it please the Court?  I'd like

4  to start by encouraging the Court to go along with the

5  recommendation of pretrial services in this case where

6  after an assessment of Mr. Lustgarten, after an assessment

7  of his family came to the conclusion that a percentage

8  bond is respectfully recommended with the following

9  conditions and there are conditions there.  The last time

10  that we were in Court, I advised the Court that he had

11  ties to this community and with the Court's permission

12  without necessarily calling them his witnesses, I asked

13  them to stand up.  Last time his daughter was here and

14  this time his wife is in the row there.  That is Claudia

15  Fishbach de Lustgarten Acherman (ph).  Standing up before

16  the Court who next to her is her father, Mr. Raul

17  Fishbach.  Next to him is Katalina Blatt de Fishbach.

18  Next to her is their son Max Fishbach, the brother-in-law.

19  Mr. Lustgarten Acherman's brother, Mois (ph) present in

20  the courtroom and his daughter who resides here in the

21  Boston area is in the courtroom as well.  She's a student

22  at Boston College.  Boston University, I'm sorry.  In that

23  regard I can appreciate all of these charts and items that

24  the prosecution has put together in this case

25  inaccurately.  With regard to the first accounts that they

1  list one through seven, they're not even him.  I mean

2  these are accusations put forth by the prosecution and I

3  say somewhat speciously in certain matters, when they talk

4  about, it's easy to talk about terrorism.  It's easy to

5  talk about drugs and all of those types of things, but yet

6  when it came down to it and I'm not going to go through

7  the six affidavits that were used to obtain wire taps,

8  Title IIIs, not even a request of a wire on Mr. Lustgarten

9  Acherman.  They were on somebody else, somebody completely

10  different.  There was not even a request.  Even, you'd

11  think after 90 days of listening they'd go in and say okay

12  we want to go against somebody else, but they didn't even

13  do that.  Why?  Because it's spoken to rather clearly,

14  rather clearly in the affidavits in that the prosecution

15  couldn't even get it straight with the other prosecution

16  they're represent, that was prosecuting Mr. Bendayan who

17  interestingly enough is not even in this Court, although

18  he is charged, although he has been arrested.  He is in

19  Miami and he is there and all of the affidavits speak to

20  Mr. Bendayan, not to Mr. Lustgarten Acherman.  With that

21  being said, before the grand jury leaves out on, and this

22  was given to me in discovery just recently, on March 11th,

23  Philip LeVoy, the lead investigator in this case is before

24  the grand jury and Mr. Lustgarten Acherman as the Court

25  knows has no advocate before the grand jury.  It's a

1  prosecutor, in fact this prosecutor who was there, and

2  the proceeding goes through and then they get to the very

3  end as happens before the grand jury and the grand jurors

4  are asked if they have any questions to ask and the grand

5  juror says right, is there any conversations you had with

6  Martin the juror speaking to Mr. LeVoy that you had with

7  Martin, where he actually said right.  I mean right out to

8  anybody as far as evidence that we knew where the money

9  was coming from, that there was an actual, that even

10 though he said well, you could do this for me and all of

11 that, I mean does he know where the actual source is or

12 any testimony or documents that shows that he knows it's

13 actually like from a drug cartel or something like that?

14 And the prosecutor, it was Mr. Gallagher, changes the

15 question around, changes the question.  Grand jurors,

16 making the specific inquiry, but Mr. Gallagher was the

17 prosecutor working this case with the prosecutor here in

18 the courtroom says, in this conversation, did Martin

19 reference getting dollars from the black market?  Answer,

20 yes he did.  The grand jury wasn't satisfied with that.

21 The grand juror wouldn't buy into that.  It says,

22 question, from the grand juror.  Did he reference getting

23 dollars from drug traffickers?

24         Answer, no.

25         And is that something that was ever mentioned in

1 the wiretap, that this money was drugs?

2          No.

3          Those are the specific responses from the lead

4 agent in this case.  I've - yes and I will offer this as

5 an exhibit for purposes of this hearing if that's okay

6 with the Court?

7                    EXHIBIT 3, ADMITTED

8          MR. DIAMOND:  This is the sworn testimony of the

9 lead agent and interestingly enough, and this is two days

10 before indictment or a short time before I should say.  I

11 can't speak to that but within a month.  Okay, three

12 months ago.  Then we get into the applications.

13          THE COURT:  Can we go back a minute though?

14          MR. DIAMOND:  Yes.

15          THE COURT:  You started this by saying that in

16 Exhibit 1 the first six or so, seven were not this

17 defendant's.

18          MR. DIAMOND:  Correct.

19          THE COURT:  What did you mean by that?  He has

20 no relationship to any of these agents, these companies?

21          MR. DIAMOND:  Do you have any relationships with

22 the agents?

23          THE DEFENDANT:  I don't have a relationship to

24 these accounts - (inaudible - #10:31:32 AM)

25          MR. DIAMOND:  Yes.  He has no relationship with

14

these accounts.  These were accounts of Eduardo Soto and

he together.  In other words their companies were

associated.  There was what we call trade - excuse me.

These were contracts that were being entered, not for

purposes of money laundering but purchase order financing.

This is a very complex case, a very complex case in that

what it is is the problems in dealing financially with

Venezuela and companies like Hewlett Packard, companies

that Mr. Lustgarten Acherman was dealing with in this

purchase order financing.  And in those situations there

was monies that were going back and forth and there were

associations made, Mr. Soto being one and they call him an

unindicted coconspirator.  Well he's unindicted.  Putting

the word coconspirator on there, again doesn't speak to

the issue that we have here, that there was no money

laundering to take place.  That's the point.

          With regard to the--

          THE COURT:  Wait so, I mean I obviously can't

try this case here--

          MR. DIAMOND:  No.

          THE COURT:  --is it your position that there was

these monies that were going in and out but it wasn't to

your client's knowledge, drug money?

          MR. DIAMOND:  Correct.  That's--

          THE COURT:  Is that, that's where you're going

1  with this?

2        MR. DIAMOND:  There was clearly these financing

3  situations that were taking place.  If I was buying

4  something in a foreign country, Venezuela because of the

5  banking system there would not allow that company to be

6  paid at that time.  It had to be approved and processed

7  and sent through.  People couldn't get the credit.  It's a

8  common practice in countries like this.  It is not

9  illegal.  So--

10        THE COURT:  But I have here an excerpt from a

11 telephone conversation that seems to indicate that the

12 intent of doing that, and I recognize this as a snippet of

13 what the information is here, but I do have what the

14 government has given me which indicates that there are

15 people with whom the defendant is doing business who are

16 known to him to be committing crimes so that turning them

17 over to the government is in his behalf.

18        MR. DIAMOND:  Yeah.

19        THE COURT:  I mean that's what this says.  I

20 have no idea if it's true.

21        MR. DIAMOND:  What he did, he does say things

22 like that but he gave those people to the DEA.  He gave

23 those up.  He was a confidential informant, a documented

24 one.  There was Agent LeVoy and then there was a separate

25 Agent DeJoy who worked with Mr. Lustgarten and he gave

1 them to him and he speaks to it even further in the,

2 it's not a conversation, it's a text messaging type of

3 situation and what it is is he says to them, I gave them

4 to them.  I gave it, in fact in one case he even took it

5 even further when the DEA didn't take it, he took it to

6 the New York Attorney General's office, an Iranian

7 gentleman, and that's all, let me, if I can have a second

8 please.  Oh, you took mine.  Okay, right above where he,

9 where Mr. Palazzo's speaking, page 5, and that he, and I

10 enjoy very high level of protection because I delivered

11 already a couple of drug dealers, delivered meaning to the

12 Drug Enforcement Administration, and spoke to them about

13 others as well and had continued to speak to them about

14 others.  So yeah, he knew that there were people engaged

15 in that type of activity and was turning it over to the

16 drug enforcement administration or law enforcement as it

17 was necessary.  What it doesn't speak to are the other

18 conversations that he has.  That he vetted everybody, that

19 he made sure that they were all legitimate and then he

20 uses the word kosher.  Mr. Lustgarten Acherman is of the

21 Jewish faith and he is religious and the words he used

22 were, I make sure they're kosher.  Don't do business with

23 them if they're not.  And I think he even finishes these

24 text messagings with the fact that he gives them up and he

25 makes sure that everybody is kosher, and it's clearly in

1  the applications in the affidavits and the grand jury

2  testimony of Mr. LeVoy.  He's told him, I make sure

3  they're kosher and his dealings with Bendayan.  Bendayan

4  was off trying to make a situation happen in terms of one

5  of these contracts.  He would then, he would then tell

6  them they have to be vetted.  We have to check them.  He

7  would get all the documents.  He would get all the

8  paperwork.  He would get all their finances.  He would

9  even, on one occasion Mr. Bendayan was doing business with

10 some people in Columbia and at that point they even went

11 to see the factory and then Bendayan cuts him out of the

12 deal.  So there are clearly in each one of these

13 transactions, these trade based financing situations had

14 to be vetted by the governments of both countries.

15          It really comes down to a very simple fact that

16 this accused is not, is not involved in any drug money

17 laundering and he, the reason I started off by introducing

18 the family members is because we have his own residence in

19 South Florida with an approximate value of $675,000 that

20 he can post.  It has an equity of about $475,000.  I went

21 through, thanks to your staff of getting the title

22 policies on them and vetting the properties themselves and

23 getting comparables on them, $475,000.  We have the

24 residence of the mother-in-law, Katalina Blatt de Fishbach

25 in the same building.  It has a value of $675,000 that she

1  is willing to sign and post on this. There is another

2  property that is owned by his brother that lives, that is

3  at, in South Florida and that property has a value of

4  approximately $573,000 and he's willing to sign on as a

5  co-surety. Everybody stands behind him. These accounts

6  in all, most of them are gone or frozen. There is no

7  monies out there and more than the money aspect of it,

8  this is family. This is family. He is not running on his

9  family. He's not going to have his mother-in-law and

10 father-in-law run, on the street with this kind of

11 situation. He will stand good with whatever conditions

12 this Court chooses to set on him, and I would add to it a

13 corporate surety bond if the Court deems that necessary

14 because I understand that corporate sureties even run out

15 and look for people and go after people even if under the

16 worst case scenarios. They have his passports. He's not

17 going anywhere. He's not doing anything but to see this

18 case through and that's been his desire throughout. The

19 situation is very simple. He was not laundering drug

20 proceeds and that's what it comes down to. And it even

21 goes back to this jurisdiction in 2009 and that's in my

22 papers, and again I don't want to be repetitious over it,

23 but they went ahead and, the government did, the

24 prosecution did and they went ahead and seized money from

25 him and gave it back less than it would cost him to hire

1 counsel to get that money back. That shows the weakness

2 of their case. Their own agents did it. When you go back

3 and you look at the conflict, even in their wiretap

4 applications they say that the United States Attorney's

5 Office in Miami does not agree with the application, does

6 not agree with the facts as they were dealt with by Mr.

7 LeVoy. He doesn't see it as drug money. And in fact he

8 says in it, I don't see any drug money as it relates to

9 Mr. Lustgarten Acherman. He's going to see this case

10 through from a personal standpoint, for the purposes of

11 making himself with his family. He's not putting his

12 family on the street. He finds this prosecution offensive

13 and he wants to see it through to the end, and I think

14 that there are conditions and that there are a bond that

15 this Court can set that would allow him to see it through

16 completion from his residence, under electronic

17 monitoring, with GPS tracking as we have in Florida. I

18 don't know if it's up here, I'm from Florida, and that

19 anytime he has to leave that residence he needs permission

20 and they can actually track what streets he takes to get

21 to my office. It's that simple.

22        THE COURT: What was the bankruptcy?

23        MR. DIAMOND: The bankruptcy dealt with a bank

24 when he was doing this type of trading. It was a bank

25 that, Credit, okay, Credit Abricol Indo Swiss (ph), and

1 what happened was there was a lawsuit over monies that

2 they mishandled.  He sued and they sued and when they

3 countersued they were allowed attorney's fees and they

4 were substantial and as a result of those attorney's fees

5 he had to declare bankruptcy but it was ultimately

6 dismissed.

7          THE COURT:  What does that mean?  That means he

8 didn't follow through the bankruptcy?  Is that what--

9          THE DEFENDANT:  It was dismissed.  It was

10 dismissed.

11          MR. DIAMOND:  I was not his counsel at the time.

12 I'm finding out now.  No, tell me right now.

13          THE DEFENDANT:  It was dismissed.  The

14 bankruptcy was dismissed.

15          MR. DIAMOND:  I got it.  I got it.  At that

16 time, Mr. Lustgarten was doing foreign exchange trading,

17 the bank mishandled those funds and at the time the case

18 was dismissed.  It went away.

19          THE COURT:  Okay.

20          MR. DIAMOND:  Thank you.

21          MS. FERGUSON:  Your Honor, may I?

22          THE COURT:  Yes.

23          MS. FERGUSON:  Just a couple of brief points

24 here in conclusion, Your Honor.  With respect to the money

25 there's two issues as the Court is well aware.  Issue

1   number one is the money dirty or is the money legitimate

2   going to sort of the facts of the case and the strength of

3   the government's case.  The parties obviously disagree

4   with respect to that point.  Point number two is very

5   important in the context of the defendant's flight and

6   that is, is this accurate.  Did this money actually move

7   through his accounts?  Did he actually have access to

8   these resources and he did, Your Honor.  Whether it was

9   clean or it was dirty, this was money that was moving

10  through his accounts over, I mean this is just a short

11  snapshot here that we're looking at and it's $546 hundred

12  million moving out of accounts that were associated with

13  him.  He clearly has access to substantial resources and

14  again this is just a piece of it, Your Honor.  We don't

15  even have a complete picture of this defendant's financial

16  resources which makes it virtually impossible to evaluate

17  the meaningfulness of any proposed bond.  You know he's -

18  just here today we heard him say, well those first seven

19  accounts, those aren't my accounts and then two minutes

20  later, well they're my accounts but it's not dirty money

21  so I mean it's impossible to tell what actually is the

22  financial picture here, Your Honor.  He tells us that you

23  know, all of his accounts are gone.  Well in the weeks

24  leading up to his arrest, Your Honor, the bank records

25  show that he started closing accounts and moving money out

1   and where that money went, the government does not know.

2   The government since the time of his arrest has learned of

3   three additional accounts of which the government was not

4   aware.  When it was contacted by financial institutions

5   when the defendant attempted to drain those accounts using

6   people like, his wife who's here in Court today, using

7   people like Eduardo Soto who you heard about in the

8   context of that chat conversation that you have before

9   you.  So that was hundreds of thousands of dollars of

10  which the government had not previously been aware that we

11  then learned about after his arrest.  There is still more

12  out there, Your Honor.  We are aware of bank accounts in

13  Switzerland.  We don't know the amount of money that's in

14  them.  There is an MLAT pending with Switzerland, Your

15  Honor.  So this is a huge amount of money and still there

16  is more.  You know, one point some odd million dollars,

17  two million dollars is just a mere drop in the bucket here

18  in terms of what this defendant has access to.

19          And finally, Your Honor, we would just mention

20  again, I know we've said it before and that it's in the

21  papers that we filed but this defendant is a citizen of

22  Venezuela, Your Honor, and Venezuela will not extradite to

23  the United States.  If he goes we cannot get him back.  It

24  would be a very rational choice to go, Your Honor, and

25  even with seizing his, taking his passport, as the Court

1  is well aware that is not a guarantee as to a

2  defendant's--

3          THE COURT:  Unfortunately, I am aware of that.

4          MS. FERGUSON:  --a defendant's ability to leave

5  so we would just emphasize that again.  It's a point that

6  bears repeating, Venezuela will not extradite, Your Honor,

7  and for all of these reasons we do believe that there is

8  no condition or combination of conditions that would

9  reasonably assure Mr. Lustgarten's appearance in Court and

10 we do request that he be detained.  Thank you.

11         MR. DIAMOND:  I'm sorry.

12         THE COURT:  No, go ahead.

13         MR. DIAMOND:  But with regard to the monies.

14 This was again financing situations, money would come in

15 and money would go out.  Money that would come in, the

16 money would then go out.  These were deals went to Hewlett

17 Packard.  Deals went like that.  It's not his monies.

18 These funds were utilized for different things and the

19 government seized the whole bunch of them.  It's been five

20 years since he's been in Venezuela.  He has more ties to

21 Miami than Venezuela.  There's absolutely no way he would

22 go back to Venezuela.  He left there more than five years

23 ago for a reason.  His family is not in Venezuela.  He has

24 one brother who is coming to the United States and

25 establishing his residency and is willing to put up a

1 property in Turnberry Aventura, Florida and is willing

2 to put up his property. There is nothing in Venezuela.

3 It's that simple and I just wanted the Court to be aware

4 of that.

5        THE COURT: All right. I have to say I'm not

6 unsympathetic to the defendant's position, but I think

7 it's just based on the merits of the case, and right now I

8 have an indictment and I am bound by that indictment as to

9 the facts of that indictment as of this point. The

10 allegations in the indictment and the amount of money that

11 the defendant has access to does make this the classic

12 case where he will be detained as a risk of flight. That

13 can be reconsidered later on in the case as things

14 progress, but I feel that in view of the allegations which

15 a grand jury did find regardless of, you know, I have an

16 excerpt here. That's all I have. But I have, I do have

17 the indictment. I do have an incredible amount of money

18 in undefined places and ties throughout the world. So it

19 is with sadness, but I do find that the defendant does

20 need to be detained.

21        Okay. I will issue a decision. You can appeal

22 that to the district court.

23        MR. PALAZZO: Thank you, Your Honor.

24        THE COURT: All right.

25 (Court adjourned)

CERTIFICATION

I, Maryann V. Young, court approved transcriber,
certify that the foregoing is a correct transcript from
the official digital sound recording of the proceedings in
the above-entitled matter.


/s/ Maryann V. Young                June 23, 2015