UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
       Plaintiff,             )
                              )
vs.                           )
                              ) Criminal Action
MARTIN LUSTGARTEN ACHERMAN,   ) No. 15-10046-LTS
       Defendant.             )
                              )
                              )
                              )
```

**MOTION HEARING**

BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
Boston, Massachusetts 02210
July 10, 2015
10:30 a.m.

\* \* \* \*

CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

APPEARANCES:

For the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE
(By: AUSA Katherine H. Ferguson)
     John J. Moakley Courthouse
     One Courthouse Way, Suite 9200
     Boston, MA 02210

-and-

UNITED STATES DEPARTMENT OF JUSTICE
(By: Joseph Palazzo, Esq.)
     1400 New York Avenue, N.W.
     10th Floor
     Washington, DC 20005


For the Defendant:

MULLANE, MICHEL & McINNES
(By: E. Peter Mullane, Esq.)
     6 Bennett Street
     Cambridge, MA 02138-5736

-and-

NATHAN P DIAMOND, P.A.
(By: Nathan P. Diamond, Esq.)
     888 Biscayne Boulevard
     Suite 501
     Miami, FL 33132

P R O C E E D I N G S

    (The following proceedings were held in open court before the Honorable Leo T. Sorokin, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on July 10, 2015.

    The defendant, Martin Lustgarten Acherman, is present with counsel.  Assistant United States Attorneys Katherine H. Ferguson and Joseph Palazzo are present.)

    COURTROOM DEPUTY CLERK SIMEONE:  All rise.  United States District Court for the District of Massachusetts is now in session.  Honorable Leo T. Sorokin is presiding.

    THE COURT:  Please be seated.

    COURTROOM DEPUTY CLERK SIMEONE:  Today is July 10th. The case of the United States vs. Acherman, Criminal Action No. 15-10046 will now be heard before this Court.  If counsel can please identify themselves.

    MS. FERGUSON:  Good morning, your Honor.  Kate Ferguson on behalf of the government, and with me is Joseph Palazzo from the Asset Forfeiture and Money Laundering section in Washington, D.C.

    THE COURT:  Okay.

    MR. MULLANE:  Peter Mullane for the defendant.

    MR. DIAMOND:  May it please the Court.  Nathan Diamond on behalf of Martin Lustgarten Acherman who stands

1    beside me.  Good morning.

2            THE COURT:  Good morning.

3            So, I've read all your papers.  We're here for a

4    hearing on the defendant's appeal of the order of detention,

5    be it the one from Judge Dein or the one from the Magistrate

6    Judge in Florida.

7            I'm not anticipating today witnesses.  I think that's

8    what we anticipated, right?

9            MR. DIAMOND:  Well, as the Court can probably see,

10   we're not because I think that was left up to the prosecution

11   and they didn't -- they indicated that they were not bringing

12   any in, but I think that the Court can see from the

13   memorandum, from the pleadings, from the documents, at least

14   some of the level of frustration that is reached in this case

15   as a result of the prosecution proceeding by proffer and it

16   becomes increasingly more difficult.

17           I have an exhibit that I'd like to file under seal as

18   well because there was a cutting -- cutoff date for discovery

19   on the 6th, July 6th.

20           In our frustration, Mr. Mullen and I requested that

21   it be provided and yesterday I flew here.  Yesterday we had a

22   meeting with Mr. Lustgarten Acherman where he's being detained

23   at Wyatt, which is another issue I'd like to speak to in terms

24   of a consideration as it relates to the --

25           THE COURT:  Let me address the question of the

1　　computer at Wyatt that you raised in your papers.

2　　　　　　MR. DIAMOND:  Yes.

3　　　　　　THE COURT:  So, here's my view of that.  Mr.

4　　Lustgarten gets no privilege other than the privilege accorded

5　　every defendant in pretrial detention.  All right?  Every

6　　defendant in pretrial detention is entitled to review the

7　　electronic discovery in their case, in my view, with

8　　computers, and it's my understanding that that provision is

9　　made available to do that.  It might not always be as ideal a

10　　provision as it would be if someone were on release, but it is

11　　supposed to be sufficient.

12　　　　　　I know of many -- obviously, there are many cases

13　　where there's tons of electronic evidence, you know.  It's

14　　virtually all being produced electronically now, anyway.

15　　　　　　So, in the first instance, even if I were to release

16　　him -- if I weren't going to release him today, but -- you

17　　know, within that interim period of time, or if I detain him

18　　while he's detained, what I would say to you is this with

19　　regard to that.  Because I saw that and I view that as a

20　　significant and serious issue.

21　　　　　　It's not an issue that would make me ordinarily

22　　release somebody, because if the incarceration is not

23　　complying with people's rights to view the evidence to defend

24　　them, the remedy is we're going to fix that so that they are.

25　　I'm not going to disregard the statutes that would have

1     required that person to be detained, is to talk to (A) the

2     marshals and (B) the Federal Public Defender Office.  I say

3     the Federal Public Defender Office because they have a lot of

4     experience with people in custody who have electronic evidence

5     and have worked the issues out.  So, it comes up occasionally

6     in cases, but I haven't seen it come up a lot.  And so, my

7     sense is -- from that, that the lawyers have been able to work

8     out mechanisms that are reasonably sufficient.  I know I've

9     had cases with people at Wyatt with a lot of electronic

10    evidence.

11          Now, if you talk to the marshals and you talk to the

12    Federal Defender and Wyatt and then you come back to me and

13    you say, Judge, specifically, here's the problem and here's

14    how it's working and here's how vis-a-vis the evidence in my

15    case it's impairing his ability to prepare and here's a

16    reasonable way it could or should work at Wyatt so that while

17    he's at Wyatt, he can see it better, I'll listen to that.

18          MR. DIAMOND:  I appreciate that, because I can tell

19    you my frustration as it relates to that.  Last time I was

20    here, I spent two days with Martin and when I went out there,

21    the gentleman seemed nice enough and then it looked as if we

22    were under surveillance.  It made -- it had a very chilling

23    effect on my ability to represent Mr. Lustgarten, and then the

24    guy opens the door and says he can't touch the computer.

25          Now, there are other issues with other people there

1    besides being denied his Sixth Amendment right to effective

2    assistance of counsel.  He's got First Amendment issues as

3    well out there.  So, I don't know -- again, this is the

4    first--

5           THE COURT:  So, here's my view.  The question of

6    detention is a question of the application of the statute and

7    the Rules of Evidence in this case.  The question of the

8    conditions of confinement, whether they comply with all of the

9    requirements of either the Constitution or his other rights

10    that he might have, I'd say, in the first instance, do what is

11    the sensible thing to do in any situation, which is go talk to

12    the people responsible for what is the specific issue.  The

13    marshals -- Wyatt is under contract with the marshals and they

14    answer to the marshals.  Talk to the marshals about it.  Talk

15    to the Federal Public Defender Office about it because they

16    have lots of people there so they would have experience.  They

17    may have had experience with the very issues you're struggling

18    with and they may know how to solve those problems and what

19    you want to do is solve those problems as simply and as

20    quickly as you can.  You're not really looking for major

21    constitutional litigation over his religious rights, if that's

22    what you're referring to.

23           MR. DIAMOND:  That's part of it as well.  It's the

24    same guard, same person, took his Talis and Tefillin and

25    called it a "gold pro," threw it to another individual and

said -- Martin usually takes it, leaves it in an office.  It

goes someplace and then he puts it in a bag.  This fellow

says, I'll take it.  He throws it to someone else.  It's all

over the floor.  It's just -- it's obnoxious, is what it was,

and I felt like telling it to this gentleman last night, but I

had to keep my --

    THE COURT:  Right.  So, you should raise that in the

first instance.  You should tell the marshals about that

incident and if you know the name of the person, you should

explain that to him.  That's not the kind of conduct, from

what you describe, that -- certainly doesn't sound like

appropriate conduct and it doesn't sound like the kind of

appropriate treatment of religious items that you would expect

from a person who might not be a public officer because Wyatt,

I think, is a private institution, but, nonetheless, there's

discharging, if you will, of public duties in some way by

contract.  So -- and I would then -- if you can't reach

resolution of it, then bring it to the Court.

    MR. DIAMOND:  I'm hoping we can reach resolution with

a court order today in terms of the appeal --

    THE COURT:  So, let me tell you -- I have some

questions with respect to -- I'll tell you my questions

regarding the detention issue.

    I've read all the papers.  I have some questions for

each of you.  Let's start with the government with my

1    questions.

2          So, the first question is just explain to me so I

3    understand a little better in really simple terms the scheme

4    that is alleged.  As I understand the scheme that's alleged,

5    the defendant would take, for example, a million dollars in

6    cash from somebody in the United States who, in fact, is a

7    drug dealer and, in fact, the money is proceeds of drug money.

8    That would be one way in which the scheme or the offenses were

9    committed, right?  The beginning of it.  Am I right so far?

10   That is, the source of the money would -- it would sometimes

11   come from the United States?

12         MR. PALAZZO:  Maybe not directly.  Ultimately the

13   source of the drug proceeds is the United States, but there's

14   a significant international aspect.

15         THE COURT:  So, it might be that by the time when he

16   first received the money, he wouldn't have received it in the

17   United States?

18         MR. PALAZZO:  Correct, your Honor, and there may be

19   some instances where that has happened, but that's not the

20   basic scheme.  The basic --

21         THE COURT:  What's the basic scheme?

22         MR. PALAZZO:  -- is that he receives money -- it's

23   very unique to his access to Venezuela and his knowledge of

24   the Venezuelan economy and the markets down there.

25         As the Court probably well knows, the economic

1  situation is fairly unique in that the government has very

2  tight controls on all currency going in and out of the

3  country, no matter what the denomination is, no matter what

4  currency it actually is.  However, the business community down

5  there, as does the entire international business community,

6  usually operates in U.S. dollars.  So, there's a market of

7  importers, let's just say, of retail goods.

8      THE COURT:  So, I'm GE and I'm selling washer/dryers

9  to a company that sells my washer/dryers in Venezuela.  I'm

10 going to ship them a thousand washer/dryers and I'm going to

11 sell it to them for $10 million and I want to be paid in U.S.

12 dollars.

13     MR. PALAZZO:  Correct, your Honor.

14     THE COURT:  So, then I'm shipping the stuff, but they

15 have got to get $10 million out of Venezuela?

16     MR. PALAZZO:  Correct, your Honor.

17     THE COURT:  So, they have to go on the official

18 exchange market, which is not so favorable exchange, the

19 Venezuelan currency for dollars, get permission from the

20 government to ship the $10 million check to GE?

21     MR. PALAZZO:  That's right, your Honor, or a wire.

22     THE COURT:  Or a wire.  All right.

23     So, what does Mr. Lustgarten do, somewhere this

24 money, U.S. -- that creates -- in other words, you're saying

25 there's a desire for a source of U.S. dollars in Venezuela not

1  through the official markets?

2       MR. PALAZZO:  There is a tremendous vacuum for U.S.

3  dollars that are needed by, for lack of a better word, legit

4  businessmen in Venezuela.  Regular importers from mom and

5  pop --

6       THE COURT:  So, they might be buying dollars on the

7  Black Market, not through the official exchange rate?

8       MR. PALAZZO:  That's right.

9       THE COURT:  And that aspect, whatever its legality,

10  Venezuela is not the focus of your indictment?

11       MR. PALAZZO:  Correct, your Honor, but Mr. Lustgarten

12  is part of that Black Market.  He is a significant player in

13  that Black Market.  That's not why he's here today.  He's --

14       THE COURT:  So, just to pause this.

15       MR. PALAZZO:  Sure.

16       THE COURT:  The one thing you think he does or did

17  was sell U.S. dollars to people in Venezuela for Bolivian

18  currency at rates different than the official exchange rate on

19  the Black Market.  Whether that's legal or illegal in

20  Venezuela, that's not why he's here, although that might play

21  into the case a little bit?

22       MR. PALAZZO:  Yes.  And we're talking about bolivars,

23  the Venezuelan --

24       THE COURT:  All right.  So, he gets some money from

25  someone you say is a drug dealer and you say the money is drug

1    proceeds and he receives that money somewhere in the world,

2    but not in Venezuela and not necessarily in the United States?

3              MR. PALAZZO:  Correct.  Correct, your Honor.

4              Part of this also is that in the middle of this

5    scheme, he moved to Panama and operated out of Panama.  So,

6    that's sort of changed the variables a little bit, but

7    essentially he's a market maker.  He's putting people who need

8    U.S. dollars --

9              THE COURT:  So, the drug dealer goes to him, to that

10   million dollars, gets him the million dollars, gets the

11   million dollars into a bank account controlled by the

12   defendant, right?

13             MR. PALAZZO:  That's right, your Honor.

14             THE COURT:  You say ultimately that million dollars,

15   not -- originally that million dollars was proceeds of a drug

16   transaction in the United States.  Perhaps Mr. Lustgarten got

17   it in the United States, but, more likely, he received the

18   money overseas somewhere?

19             MR. PALAZZO:  Correct, your Honor.  And then at the

20   very end of the scheme, those U.S. dollars ultimately flow

21   back to the United States.

22             THE COURT:  So, wait.  What does he do with the

23   million dollars, gets it into a bank account somewhere?

24             MR. PALAZZO:  Yes.  He has a network of shell

25   corporations all around the world, Singapore, Hong Kong,

1    Columbia, and he also has surrogates who act on his behalf,

2    other people who are co-defendants in this case.

3           THE COURT:  So, the million dollars hits either one

4    of these shell companies or a company or bank account

5    controlled by one of his, as you put it, surrogates?

6           MR. PALAZZO:  Yes.

7           THE COURT:  Now what happens?

8           MR. PALAZZO:  And in simplest terms, that third party

9    to the transaction that is controlled by the defendant --

10          THE COURT:  The surrogate.

11          MR. PALAZZO:  -- pays -- no.  He is essentially --

12   there's a buyer in Venezuela and a seller in the United

13   States.

14          THE COURT:  So, there's a buyer in Venezuela who

15   wants a million dollars and -- wants one million U.S. dollars.

16          MR. PALAZZO:  To be paid out in the United States to

17   its supplier, like GE or --

18          THE COURT:  So, the guy buying the washer/dryers

19   calls Mr. Lustgarten and says, I want you to pay a million

20   dollars to GE on my behalf?

21          MR. PALAZZO:  Correct.

22          THE COURT:  And Mr. Lustgarten, you say, gets a

23   million dollars in -- from a drug dealer, which is proceeds of

24   U.S. -- from the U.S., but he gets it into a bank -- it's

25   first within his possession, custody or control, if you will,

1     for example, in Hong Kong in a shell corporation that he

2     controls or a surrogate of his controls?

3           MR. PALAZZO:  Exactly, your Honor.

4           THE COURT:  So, the million dollars is there.  He

5     works out a deal with the GE buyer in Venezuela, for example.

6           MR. PALAZZO:  Yes.

7           THE COURT:  A legitimate businessman who is not

8     necessarily implicated in money laundering who just wants to

9     pay the million dollars to GE in the United States or some

10    other entity, and he then takes the million dollars in Hong

11    Kong and uses it to -- moves it through the international

12    network, wherever, but it might not ever go to Venezuela and

13    it ends up in GE or some other U.S. company's bank account

14    here, paying down some legitimate debt owed by the company in

15    Venezuela.

16          MR. PALAZZO:  Yes, your Honor, and he takes a piece

17    of that and he also --

18          THE COURT:  He takes a fee for doing that.

19          MR. PALAZZO:  And he takes advantage of the

20    difference in exchange rates.  So, when he sells --

21          THE COURT:  Arbitrage.

22          MR. PALAZZO:  Right.  Exactly.

23          THE COURT:  Now, what happens to the drug dealer?

24    The drug dealer has given Mr. Lustgarten a million dollars and

25    so far he hasn't gotten anything for it.

                MR. PALAZZO:  That's what takes place in Venezuela.
The City of Cúcuta, Columbia, which is on the eastern border
between -- it's on the Columbian side, but it's on the
Venezuelan border.  That is, as far as we know, is the hub of
money laundering for the drug cartels.  So, what happens next
is that the bolivars that now --

                THE COURT:  The Venezuelan legitimate businessman
paid Mr. Lustgarten.

                MR. PALAZZO:  In bolivars.

                THE COURT:  And put in the bank account in Hong Kong
or put in the bank account in Venezuela?

                MR. PALAZZO:  Can it vary.  It can vary.

                THE COURT:  All right.  What happens now?  So far the
drug dealer is still out a million in U.S. cash.

                MR. PALAZZO:  That's right, but the transfer back to
the drug dealer or the drug dealer's surrogates takes place
often in Venezuela in Venezuelan bolivars where they're then
curriered to these exchanges that they have, currency
exchanges in Cúcuta, where they're concerted to Columbian
pesos and gold.

                THE COURT:  So, the drug -- so, Mr. Lustgarten gets
the equivalent of a million dollars or thereabouts in bolivars
in Venezuela or in -- presumably in Venezuela, and then he
then sends those on in some form in some way physically or
electronically to the drug dealer or the drug dealer's

1    surrogates who originally gave him the million dollars.  At

2    that point his role in the transaction, as you allege, is

3    done.

4         MR. PALAZZO:  Yes, your Honor.  That's the very basic

5    example of what they have observed as going on.

6         There are other variations of it, though, where

7    people he's working in cohoots with, which is Salomon

8    Bendayan, a co-defendant in this case, they may take the money

9    on behalf of the drug dealer and do -- deliver it in some

10   other means or method.

11        THE COURT:  Other than go to the town you mentioned

12   and convert it to pesos?

13        MR. PALAZZO:  Yes, your Honor.  Exactly.

14        THE COURT:  So, my sense is, at least certainly for

15   bail purposes, there isn't really a dispute -- I imagine

16   there's banking records that establish all these transfers?

17        MR. PALAZZO:  Yes, your Honor.

18        THE COURT:  So, the -- my understanding is that at

19   least a significant issue that divides the parties is not

20   whether these transfers occurred, for example, in the example

21   we just described, but what the defendant knew about the

22   transfers.

23        MR. PALAZZO:  Yes, your Honor.

24        THE COURT:  So, what's the -- and that seems to be

25   the focus of his attack on the detention orders.  So, my

1    question is, what is the evidence that he knew?

2           MR. PALAZZO:  We have --

3           THE COURT:  I take it, for example, just so I'm

4    clear, if he did everything you just described in the simple

5    example, but he had no -- he neither knew nor was he

6    recklessly disregarding knowledge that the person who gave him

7    the million dollars and who he paid later back in bolivars was

8    a drug dealer or had proceeds -- was giving him proceeds of

9    drug distribution, then he wouldn't have committed a crime or

10   at least not the crime charged?

11          MR. PALAZZO:  Your Honor, this is all about the

12   defendant's knowledge, what he knew or should have known, but

13   a slight correction.  Although drug proceeds are a large part

14   of what we allege, the defendant is a professional money

15   launderer.  He's not really concerned with whether he's moving

16   drug proceeds or not.  If you are a tax cheat, if you have

17   corrupt --

18          THE COURT:  Could be the proceeds of other criminal

19   conduct?

20          MR. PALAZZO:  Correct.  And we have evidence of all

21   of that.

22          THE COURT:  All right.  So, if he had no reason to

23   believe -- if he did not know and did not recklessly or

24   willfully disregard information that suggested that it was

25   proceeds of unlawful -- specified unlawful criminal activity,

1  then he would not have committed -- likely not have committed

2  the offense charged?

3          MR. PALAZZO:  The money laundering count, yes, your

4  Honor.

5          THE COURT:  And the obstruction is different, I

6  understand.  All right.

7          So, what's the evidence that you point me to that

8  suggests that he knew or willfully disregarded?  One is the

9  indictment establishes probable cause.  I understand that.

10  After the indictment, what else is there?

11          MR. PALAZZO:  Well, this case comes before you, your

12  Honor, as the culmination of a significant investigation that

13  involved judicially-authorized email and phone wiretaps, among

14  other things, and in those intercepts -- we have several

15  examples here today and, you know, we --

16          THE COURT:  So, you attached one as Exhibit 2 to your

17  opposition?

18          MR. PALAZZO:  Yes, your Honor.

19          THE COURT:  What is that?  Is that a -- like a chat?

20          MR. PALAZZO:  It is.  If the Court is familiar with

21  WhatsApp.

22          THE COURT:  Somewhat.

23          MR. PALAZZO:  It is the latest and greatest chat app

24  for a mobile telephone.

25          THE COURT:  So, this is typical WhatsApp

1    conversation?

2         MR. PALAZZO:  Yes, but it was intercepted via email,

3    because part of the app's greatness is that if you want it to,

4    it will summarize and save your chats and email them to you.

5         THE COURT:  Summarize in the sense that you get the

6    whole conversation?

7         MR. PALAZZO:  Yes.  It was -- it was in his email

8    account --

9         THE COURT:  I see.

10        MR. PALAZZO:  -- as created.  So --

11        THE COURT:  So, MLA is the defendant?

12        MR. PALAZZO:  Yes, your Honor.  And the person on the

13   other end of the chat is someone we know to be a Swiss banker,

14   who I guess is no longer associated with the bank as of today,

15   but CEH Bank is a private wealth manager based in Geneva and

16   this Mr. De Beaumont handled accounts for the defendant and

17   for others.

18        THE COURT:  So, one piece of that evidence that you

19   have is this conversation where some of the things he says

20   there --

21        MR. PALAZZO:  Yes.  Admissions, your Honor.

22        THE COURT:  Mm-hmm.

23        MR. PALAZZO:  Specifically, some of the people he

24   mentions by name are very well known to the government and are

25   part of this investigation.  There's a Maffi, M-a-f-f-i,

1   that's referred to.

2           THE COURT:  Yes.  Is this conversation the larger

3   version of what was referred to at the detention hearing in

4   Florida or before Judge Dein?  There was a short snippet about

5   Maffi.  Did that come from this or did that Maffi snippet come

6   from somewhere else?

7           MR. PALAZZO:  It would not have come from the Florida

8   detention hearing, I can assure you -- well, this Mr. Maffi

9   has come up a lot.

10          MR. DIAMOND:  If I can reply.

11          It was handed to me just before the hearing and I

12  believe it's the one the Court has.  It's that -- I think it's

13  three pages, two pages.  I don't have it right in front of me.

14          THE COURT:  The one I have for this hearing is more

15  than three, but Judge Dein, I think, referred to a snippet in

16  her opinion and I didn't know if it was from this

17  conversation.

18          MR. DIAMOND:  Yes, that's what it was.

19          MS. FERGUSON:  Yes, it's this conversation.

20          THE COURT:  All right.  Okay.  So, this is a 2014

21  statement with some statements which you say reflect his

22  knowledge and understanding of the nature of the people he's

23  dealing with.  Is there anything else?  I'm not saying you

24  have to.  I just want to know what the universe is that you're

25  pointing me to for purposes of here.  Is there anything else

1  besides this conversation you want to point me to?

2      MR. PALAZZO:  Yes, your Honor.  We have another

3  conversation that we can mark, with your permission, as

4  Exhibit 3.  I have just given a copy of it to my brothers.

5      THE COURT:  All right.  What is that?

6      MR. PALAZZO:  I have it right here.  May I approach?

7      THE COURT:  You may, absolutely.

8      (Attorney Palazzo hands document to the Court.)

9      THE COURT:  So, this is Exhibit 3, which is a

10  conversation from April 10th, 2014.

11      MR. PALAZZO:  You know what, your Honor?  I

12  apologize.  I think this may be Exhibit No. 4.  Did you have

13  an exhibit last time?  This may be --

14      MR. DIAMOND:  We had one exhibit last time.

15      MR. PALAZZO:  So, this would be Exhibit No. 4.  I

16  apologize.

17      MR. DIAMOND:  It was -- the exhibit that we produced

18  was the grand jury testimony of the agent who said Mr.

19  Lustgarten had no knowledge.  This is a week before the -- a

20  week before the indictment where the grand juror asked the

21  question, "Did Mr. Lustgarten know that these were drug

22  proceeds?"  And the agent unemphatically answered, "No."

23  March 11.

24      THE COURT:  Okay.  I'll look at this.  All right.

25      So, there's this conversation.  Are there

1   conversations that -- the money laundering is what time

2   period?

3           MR. PALAZZO:  The money laundering time period is

4   from 2007, I believe, until today.

5           THE COURT:  So, is the evidence supporting his state

6   of knowledge 2007 forward -- are there intercepts with

7   contemporaneous admissions during that time period?  What

8   establishes that he then -- that he knew then as opposed to he

9   later learned about what happened previously?

10          MR. PALAZZO:  Well, your Honor, there are no

11  intercepts going back to 2007.  However, the defendant is in

12  sort of a unique situation in that he formally --

13          THE COURT:  Was a source of information?

14          MR. PALAZZO:  Yes.

15          THE COURT:  Is that a confidential issue?

16          MR. DIAMOND:  Well -- it's family here.

17          We have an exhibit that we were going to provide to

18  the Court.  That's why I started with my frustration in

19  talking about the cutoff date.

20          THE COURT:  Let me just ask you about that issue.  Is

21  that an issue we should not --

22          MR. PALAZZO:  It's in the papers, your Honor.

23          MR. DIAMOND:  It's in their papers, but that's fine.

24  His name is blocked out, or whatever.  There is a concern --

25          MR. PALAZZO:  My brother made reference to it at the

1     last -- at the last hearing, I believe.

2          THE COURT:  Well, do you want -- I mean, who is here

3     besides his family?

4          MR. DIAMOND:  Family.  I don't know the two ladies in

5     the back, but the rest is family.

6          THE COURT:  All right.  So, it's up to you.  I mean,

7     from my perspective, it's --

8          MR. DIAMOND:  Go ahead.  Okay.  It's fine.  It's

9     going to be an issue at trial.

10          THE COURT:  So, he's the source of information.

11          So, the intercepts start -- when do the intercepts

12     start, about?

13          MR. PALAZZO:  In 2014.

14          THE COURT:  So, prior to 2014, your source of

15     information about his state of knowledge comes from what he

16     said to the agents when he was a source of information.

17     That's one source.

18          MR. PALAZZO:  Yes, but it's the collective knowledge

19     of the government's that the defendant has been doing this

20     kind of work for many years.

21          There was another investigation and prosecution out

22     of the District of Massachusetts where Mr. Lustgarten had

23     transactions identified and they were transactions, again,

24     with someone who we know now is a convicted drug trafficker.

25          THE COURT:  But did he then know that he was a

convicted drug trafficker?  Was he convicted at the time of

the transactions or did he know then?  Did he have information

that would suggest or behave in ways to suggest he was

disregarding things that would tell him that it was a drug

dealer or drug proceeds?

MR. PALAZZO:  Yes, your Honor.  We believe we can

show at trial beyond a reasonable doubt that he did have this

knowledge.

THE COURT:  How?

MR. PALAZZO:  We have -- we will provide witnesses to

the Court who knew Mr. Lustgarten at the time who did business

with him, and we also have -- we have witnesses who we're not

ready to reveal at this time --

THE COURT:  All right.

MR. PALAZZO:  -- but that will give direct testimony

about --

THE COURT:  So, you're going to prove his state of

knowledge or understanding in the pre-2014 time period, (A)

out of the statements that he made himself to the federal

agents during the time of his source of information, (B) out

of witnesses who did business with him who will give testimony

to the nature of his business methods or lack thereof or

statements that he might have made to them and these would

then be the kind of historical statements from the memory of

what transpired, or (C) there may be -- and you're not saying

1  that there are, but there might be people who are cooperating

2  who were complicit in some of this activity in one form or

3  another and who are testifying against him?

4          MR. PALAZZO:  Yes, your Honor.  And we also, of

5  course, have the financial transactions --

6          THE COURT:  Themselves.

7          MR. PALAZZO:  -- to demonstrate this, yes.

8          THE COURT:  There may be inference out of the

9  transactions?

10          MR. PALAZZO:  Yes.  That's correct, your Honor.

11          THE COURT:  All right.  I think I understand.  I

12  don't have any more questions for you right now.  Thank you.

13          Okay.  So, Mr. Diamond, here's my question for you.

14          MR. DIAMOND:  Yes, sir.

15          THE COURT:  The defendant has no prior criminal

16  record, right?

17          MR. PALAZZO:  That's correct, your Honor.

18          MR. DIAMOND:  That's correct.

19          THE COURT:  All right.  So, my question to you is

20  this.  The focus of your release motion -- or your appeal is,

21  essentially, that they can't prove their case and -- largely

22  and to a lesser extent, you have some conditions.

23          So, here's my question.  The way I see it, in part,

24  is this.  The indictment establishes probable cause that he

25  did.  It doesn't mean he did it, but the indictment

1    establishes probable cause, and that indictment alone is

2    enough to establish probable cause for detention purposes.

3          He's not here on a -- this isn't a danger case.  The

4    government is not arguing danger.  It's a pure risk-of-flight

5    case and -- but the relevant -- there are some things that are

6    relevant considerations.  There are the stuff of daily

7    consideration of bail hearings or release hearings, since it's

8    really more a question of release than bail.

9          He's not a U.S.  citizen.  He's a citizen of foreign

10   countries.  He's traveled a lot internationally.  It's a

11   beautiful thing to be able to travel internationally, but it

12   generally doesn't help you when you're arrested.  Generally,

13   you're better off if you've never traveled internationally.

14   It doesn't mean you can't get out if you have, but -- he's got

15   homes overseas.  He's somebody whose made a lot of money over

16   the years, separate from what was in his accounts, but the

17   information before me shows he's making a lot of money, has a

18   lot of money at his disposal.  Therefore, at least it creates

19   an inference of that.  It may be that he's broke.  I don't

20   know you well enough to know whether everybody who hires you

21   becomes broke the moment they hire you.  Maybe that's the kind

22   of place where you are at --

23         MR. DIAMOND:  No.

24         THE COURT:  -- in your career, but he may be, but I

25   don't know that and I don't have information to suggest that.

1    I only have information that he was making a lot of money at

2    the time of his arrest, that he had cash paid, a house in

3    Panama.  He had, you know, a nice apartment in Florida.  He

4    had a relatively seemingly high-octane lifestyle, financially

5    was making a fair bit of money.  Then I have an awful lot of

6    money going through his accounts that he controls.  I

7    understand the nature of his business and I understand that

8    doesn't mean he had a $100 million.

9              MR. DIAMOND:  Correct.

10             THE COURT:  But people who do business -- you know,

11   if you're a realtor selling $100,000 houses, you got to sell a

12   lot of houses to make the kind of money that people who are

13   selling $10 million houses make, and the people who deal with

14   people with a lot of money tend to make more money.  The rates

15   are higher and your share of what's going through your hands.

16   So, there's a lot of money going through his hands.

17             The banks that have a billion in deposits generally

18   do better than -- or have more profits or more money at their

19   access than the banks with a million in deposits.

20             So, there's a lot of money going through his

21   accounts, maybe upwards of $100 million or more.  That's a lot

22   of money.  That and it's in complicated international

23   financial transactions.

24             All of that, suffice it to say, creates a -- creates

25   a risk of flight.  That, in my mind, there's no doubt.  I'm

1   not saying that it means he's -- that someone in that

2   situation can never be released, but it creates a risk of

3   flight and a substantial concern.  And two magistrate judges,

4   one of whom I know and I know to be careful and thoughtful --

5   I assume the same of the one in Florida.  I just never met him

6   before, but he seemed to have rendered a thoughtful

7   decision -- considered the issues and weighed the issues.  I

8   make a de novo determination and I will, but given these

9   considerations, I see risk of flight.

10          So, is it a triable case?  It might well be.  I'm not

11  -- that's not for me to judge, but to persuade me that it's an

12  impossible case to prove, that is that they have no evidence,

13  is hard.

14          It may be that these conversations that -- the one

15  I've looked at and the one I will look at -- are susceptible

16  to different interpretations, but they're at least susceptible

17  -- the one that the government attached is susceptible to the

18  interpretation that the government gives it, and they

19  represent -- and I assume that's the reason the grand jury

20  issued an indictment -- that they have witnesses who will

21  provide evidence regarding the earlier time periods.

22          So, I come to, then, what do I have before me to --

23  either what can you show me that really dramatically and

24  significantly minimizes (A ) you know, really says, Hmm, this

25  case really isn't that much, mindful of the fact that I

believe the First Circuit has said that of the factors I
consider, weight of the evidence is actually a lesser factor,
that it's not the strongest factor to consider.  It's not --
wouldn't always be obvious that that would be the way to think
about it, but I believe that's the way the First Circuit has
established the law.

And then what I have is this as conditions, if I
understand them correctly:  (A) He would -- there would be a
million or million and a quarter in security posted that would
be in the form of bonds signed by family members, right?  And
from the little bit of description that you give me, it sounds
like (A) they might be -- they might be able to make good on
the bonds if he left, but if they had to make good on the
bonds from their own personal funds, it would be -- it might
be meaningful hardship on them and -- but given -- the concern
I have in a case like this is given the amount of money that
has run through his accounts and the sort of picture one has,
it may be that the amount of money being posted isn't that
significant, necessarily.  It might be significant to the
people posting it, but it might not be significant to the
defendant.  That's the concern I have.

And so, then, what I'm weighing in my mind is I'm not
sure there's any conditions that really mitigate the risk of
flight.  I tell you all this because that's what I'm thinking
about.  I've read all the papers.  So, the question to you is

1  about what that?

2      MR. DIAMOND:  I appreciate that and I appreciate it

3  because I've been troubled by this situation from the day of

4  Martin's arrest when I appeared before Judge Torres, and the

5  most troubling part of it is the lack of candor, the lack of

6  what is told to the courts.  Yes, it's easy to get a grand

7  jury to indict and that is -- and that's not the end all and

8  be all, because, otherwise, everybody would be detained that

9  is indicted.

10      But what happens in this case is they come before a

11  grand jury.  There's nobody advocating for Martin but for a

12  single grand juror who raises his hand and asks, Were there

13  drug proceeds?  And the agent is interrupted by a prosecutor

14  and then that prosecutor tries to change the question.  The

15  grand juror did not relent and they say, Were they drug

16  proceeds?  And the answer by the agent whose been on this from

17  what I can tell from the beginning says, "No."

18      So, now I leave the courtroom.  I'm handed 730 pages

19  of applications for Wyatt.  Not a single one from Martin

20  Lustgarten's phone, not a single one.  If they had it, if they

21  had been through Columbia, if they had been through Argentina,

22  if they had been through six wires or three applications --

23  three wires here and three extensions, you would think that

24  they would come up with the slightest bit, just the slightest

25  bit to deal with that.

1       So, what do they do?  They hand me these documents,

2 and I don't even have the time to look at them because Mr.

3 Palazzo came in ten minutes before the hearing, but even Judge

4 Torres at that time said, I do think that a judge there can

5 fashion conditions.

6       We have in the courtroom Raoul Fischbach and his

7 wife, Kathleen, who is sitting here.  These are in-laws.  We

8 have in the courtroom --

9       THE COURT:  So, they're the parents of Mr.

10 Lustgarten's wife?

11       MR. DIAMOND:  Of his wife, yes.  Unfortunately,

12 because of finances, she can't be here.  His daughters can't

13 be here.  They've been here.  They were before Judge Dein, but

14 they can't be here now --

15       THE COURT:  I'm sorry.  What are their names again?

16       MR. DIAMOND:  Fischbach.

17       MR. FISCHBACH:  Raoul Fischbach.

18       THE COURT:  And where do you live?

19       MR. DIAMOND:  Florida.

20       MR. FISCHBACH:  In Florida.

21       THE COURT:  Are you a citizen of the United States?

22       MR. FISCHBACH:  Resident.

23       THE COURT:  Resident, Green Card?

24       MR. FISCHBACH:  Green Card, yes.

25       THE COURT:  All right.  The same with your wife?

1          MR. FISCHBACH:  Yes.

2          THE COURT:  How long have you lived in the United

3     States?

4          MR. FISCHBACH:  One year.

5          THE COURT:  One year.  And you're a citizen of what

6     country?

7          MR. FISCHBACH:  Venezuela.

8          THE COURT:  Venezuela.  All right.

9          MR. DIAMOND:  Distressing.  And then we have friends

10    of the family who have known -- they're from the Boston area,

11    sitting at the end of the table.  They have known Martin most

12    of his life.

13         MR. DWYER:  Correct.

14         MR. DIAMOND:  Mr. and Mrs. Dwyer, who are friends of

15    the family who showed up here just to show their support.  He

16    has nothing but support.

17         But what's most distressing is when the prosecution

18    comes to you and tells you, We've researched certain things.

19    We've researched -- they go so far as to put in their papers

20    that Mr. Lustgarten Acherman has some ties to Venezuela.

21    None.  None.  He moved out of there five years ago.  Five

22    years ago.  And based on what was occurring --

23         THE COURT:  "None" seems like a little bit strong.

24         MR. DIAMOND:  What's that?

25         THE COURT:  None?  He's a citizen of Venezuela.

1      MR. DIAMOND:  His parents --

2      THE COURT:  None is not --

3      MR. DIAMOND:  Well, he's also a citizen of someplace

4  else and that makes him deportable, as I understand it, or an

5  immigration lawyer tells me that that's the way it is.  Okay?

6  The only thing that I can tell in dealing with -- in

7  discussing it are the graves of his parents, who he has not

8  gone back to see.  Okay?  That's his ties.

9      THE COURT:  He grew up there.

10     MR. DIAMOND:  Well, he grew up there, but he got out

11 of there.

12     THE COURT:  That's a tie.  It may be that it's not

13 the strongest tie.  It may be he's not going back there, but

14 it seems to me I would be hard-pressed to find in this hearing

15 that he had no ties.  He may have no ties to the -- to Kenya,

16 but --

17     MR. DIAMOND:  More ties to Florida, more ties with

18 his daughters --

19     THE COURT:  What's his status in the United States?

20     MR. DIAMOND:  He's a tourist visa right now.

21     THE COURT:  When does that expire?

22     MR. DIAMOND:  I'm sorry?

23     THE COURT:  When does that expire?

24     MR. DIAMOND:  It goes on, I think...

25     (Discussion off the record.)

1          MR. DIAMOND:  In October and then he can renew at

2    that time.

3          His passports are in the possession of the agents.

4    They have all of his travel documents.  They were taken from

5    him.  His assets are frozen.  His assets are frozen.  If there

6    is nothing greater than a bond in this case --

7          THE COURT:  How do I know that he has no assets, that

8    all of the assets that he has have been frozen?

9          MR. DIAMOND:  Well, we can always imagine that

10   there's worlds out there, but they have seized everything they

11   know and, more importantly --

12         THE COURT:  How do I know -- how do I know that they

13   know about all his assets?

14         MR. DIAMOND:  More importantly -- and I guess we're

15   sitting here and -- his family knows, but he was a cooperating

16   witness.  I think the case they referred to the --

17         THE COURT:  Did he testify?

18         MR. DIAMOND:  I'm sorry?

19         THE COURT:  He testified?

20         MR. DIAMOND:  No.  No.  But what happened was in the

21   prior case -- in the Rosemont case, he gave an affidavit,

22   which was attached to our documents, outlining every bit of

23   financial information that he had.  He continued on in

24   meetings and provided documents to the agents as he was doing

25   other transactions and told them where all of his assets were

1    and where his bank accounts were.  So, he was laying it all

2    out for the prosecution.  He told them where the money was.

3    They went ahead and grabbed it.  So, he's a liar?  That's --

4    you know, it makes no sense.  He's working with them.  He's

5    putting himself in harm's way.  There are threats made to his

6    family.  There are threats made to him and --

7            THE COURT:  What's the evidence I have of threats?

8            MR. DIAMOND:  Unknown to this -- that this

9    prosecution was going on -- let me provide the Court -- and

10   this is why I say it's so frustrating.  Every time I get into

11   a courtroom, they wind up throwing me more documents.

12           Last night Mr. Mullen and I were going to visit

13   Martin at the Wyatt Detention Center.  I flew in yesterday so

14   that we can discuss what the procedures would be, what was

15   going on, and that's when we run into the frustration with the

16   jailer as well.

17           On the way there, in response to an email that Mr.

18   Mullane had sent -- and the Court knows the schedule.  The

19   Court knows -- very happy that the Court knows everything

20   that's taken place in this case and has studied it, but there

21   was a cutoff date of last -- of last Monday for discovery, and

22   I'd ask the Court to enforce that discovery, but for *Brady*,

23   because it seems that it's just going to be an ongoing forever

24   process with them.  That's what they did.

25           Last night I come out of Wyatt and we worked until --

1    I don't know what time, but we got a -- an email from the

2    prosecution, and I have a copy.  I've marked it as Exhibit A4

3    and I have it under seal, but however the Court wants to take

4    it, and it outlines, showing...

5            (Attorney Diamond hands document to the Court.)

6            THE COURT:  I already have this or --

7            MR. DIAMOND:  No.  This was given to me last night.

8            THE COURT:  Oh, I see.

9            MR. DIAMOND:  Last night in response to an email that

10   was sent by Mr. Mullane.  I think that's the first -- front

11   page of it and then we --

12           THE COURT:  What is this?

13           MR. DIAMOND:  This was discovery given to us last

14   night, four days, five days --

15           THE COURT:  How does this bear on whether he should

16   be released or detained?

17           MR. DIAMOND:  It shows -- what is most important in

18   it, number one, when he started as a confidential source.

19   Number two, that he continued on as a confidential source,

20   that he provided information to the police throughout about

21   financial documents, that throughout when they're saying this

22   Maffi thing, that the Court was interested in and Judge Dein

23   mentioned in her memo, he was the one who initiated the

24   investigation on Mr. Maffi.

25           THE COURT:  Was he terminated as a source of

1    information?

2            MR. DIAMOND:  Not until he was arrested.

3            MR. PALAZZO:  Yes, your Honor, in 2010, I believe --

4    2012.  I apologize.

5            MR. DIAMOND:  Excuse me.  He met with them as late as

6    2014 and in -- and every time they asked him to go someplace

7    he went.  When they said meet us in Miami, he met in Miami.

8    Meet us in Boston.  He met in Boston.  Meet us anywhere you

9    want and he would come up and meet with the agents every time.

10           THE COURT:  You mentioned the defense of public

11   authority?

12           MR. DIAMOND:  Yes, that will be part of it,

13   absolutely, because he lays out every time to them what's

14   going on.  It's even in this last document they gave us.  He's

15   talking to Bendayan, "Make it Kosher."  And I have it upon

16   information and belief, the accused in this case, the

17   co-defendant, who --

18           THE COURT:  Did he say "Bendayan" or did he say,

19   "Make it Kosher"?

20           MR. DIAMOND:  No.  He said, "Make it Kosher," but I

21   just read it.  I got it two minutes before I walked into the

22   courtroom.  And Martin is telling them, Make sure the

23   transactions you do are legitimate transactions throughout.

24   It's always been that.

25           So, they, Well, if he says, Make it a legitimate

1    transaction, he's covering something.  If he says, Do it

2    illegally, he's committing -- he's doing something else.

3    There's no winning with that kind of mentality.  There's no

4    winning with that kind of thought process.  He's telling

5    everybody he does business with, and he's going to the agents

6    and telling every agent, These are the bad guys.  These are

7    the guys that I'm dealing with.  He went to New York with Mr.

8    Gallagher.  They went to New York and met with some state

9    people in an Iranian deal, and he told them about that because

10    the federal people weren't taking it.  So, he has been there

11    for the government throughout, more importantly, besides the

12    properties that we have.

13          THE COURT:  So, tell me what exactly you want him to

14    post?

15          MR. DIAMOND:  What we would like to post?

16          THE COURT:  Yes, what you're offering to post.

17          MR. DIAMOND:  I think I laid it out.  There are

18    properties worth approximately a million and a half dollars.

19          THE COURT:  But name -- tell me what they are and who

20    they belong to.

21          MR. DIAMOND:  They belong to Mr. Lustgarten.

22          THE COURT:  That's his condominium in Florida?

23          MR. DIAMOND:  Yes.  And his in-laws.

24          THE COURT:  The condominium in Florida is owned by

25    Mr. Lustgarten and his wife?

1        MR. DIAMOND:  Yes.

2        THE COURT:  That's worth about $300,000?

3        MR. DIAMOND:  No.  I think I had it in my papers

4    initially.  I think that's paid and that's worth about 700 or

5    800.  There was a listing and --

6        THE COURT:  Which page are you referring to?

7        MR. DIAMOND:  Sorry.

8        THE COURT:  That's all right.

9        MR. DIAMOND:  Total would be about that amount.  I

10   didn't bring all -- and I have the documentation done in terms

11   of the titles and in terms of the title searches on them and

12   the appraisals.

13       THE COURT:  The two properties are the property that

14   he lives in with his wife?

15       MR. DIAMOND:  Yes.

16       THE COURT:  And that they would post?

17       MR. DIAMOND:  Yes.

18       THE COURT:  And then what's the other property, the

19   one his in-laws own, which is also in the same building?

20       MR. DIAMOND:  Yes.  Correct.  And his brother's

21   property.

22       THE COURT:  His brother -- his brother will post the

23   brother's home?

24       MR. DIAMOND:  Yes.

25       THE COURT:  Where is the brother's home?

1           MR. DIAMOND:  21 --

2           THE COURT:  What town?

3           MR. DIAMOND:  Oh, Aventura, Florida.  Miami, Florida.

4  It's just the north end of Miami.

5           THE COURT:  And who lives -- the brother lives in the

6  home with whom?

7           MR. DIAMOND:  With his family.

8           THE COURT:  He has children?

9           MR. DIAMOND: Yes.

10          THE COURT:  And is he a citizen of the U.S.?

11          MR. DIAMOND:  He's a resident.

12          THE COURT:  And he works in Florida?  He's a lawful

13  permanent resident?

14          MR. DIAMOND:  He just got -- yes, he just got here.

15  He actually moved into Florida as a lawful resident.

16          THE COURT:  And so, he's a medical doctor?

17          MR. DIAMOND:  That's a different brother who just

18  sold the house.  He would stand behind Martin as well.  He's a

19  medical doctor, but he just sold his residence and doesn't

20  have property, but he stands behind Martin.

21          THE COURT:  And the brother who is a lawful permanent

22  resident is willing to post his house does what in Florida?

23          MR. DIAMOND:  He just moved there...

24          (Discussion off the record.)

25          MR. DIAMOND:  Computer hardware.

1      THE COURT:  And from where did he move?

2      MR. DIAMOND:  From Panama.

3      (Discussion off the record.)

4      MR. DIAMOND:  From Venezuela.  I'm sorry.

5      THE COURT:  From Venezuela, all right.  And the

6  brother who is a doctor?

7      MR. DIAMOND:  He's a citizen, U.S. citizen, and lives

8  in Miami.

9      THE COURT:  Does he work?

10     MR. DIAMOND:  Yes.  He would have been here, but he's

11  traveling on a conference.

12     THE COURT:  What kind of medical doctor?

13     MR. DIAMOND:  Anesthesiologist.

14     THE COURT:  How long has he been practicing in

15  Florida?

16     (Discussion off the record.)

17     MR. DIAMOND:  20 years.

18     THE COURT:  I see.  So, he's a citizen?

19     MR. DIAMOND:  Yes.

20     THE COURT:  All right.  And he doesn't own any

21  property now?

22     MR. DIAMOND:  He was in the process, I think, of

23  looking for a new property.  He just sold one.

24     THE COURT:  All right.  So, you're posting the two --

25  the three properties --

1          MR. DIAMOND:  Three properties.

2          THE COURT:  -- you mentioned?

3          MR. DIAMOND:  Yes.

4          THE COURT:  And he would live -- you're proposing he

5 live in his own house on --

6          MR. DIAMOND:  In Aventura.

7          THE COURT:  -- home detention?

8          MR. DIAMOND:  Yes, with any other conditions that the

9 Court sees, because the other part of it is, as I say, the

10 biggest bond they have set is fighting this case along with

11 the forfeiture.  That's the -- it's 37 years of work they have

12 seized from him.  37 years of his hard-earned moneys they have

13 seized from him, and he intends to see this thing through to

14 the end.

15          THE COURT:  So, the issue in my mind is what I said

16 to you, Mr. Diamond.  The issue is whether -- I see -- I

17 understand why the Judges ruled the way they did.  I think the

18 government has established risk of flight and there's a

19 concern.

20          I certainly wouldn't -- for example, if he asked for

21 personal recognizance, this would be an easy decision.  It

22 would be no.  The government clearly has established a risk of

23 flight.  And the question is whether there are conditions that

24 could be established that would reasonably assure his

25 appearance, and I'm not sure -- I'll be honest with you.  I

1    don't know whether the conditions you proposed do that or not

2    because of the concerns I have that I raised to you before.

3    That's what I think about.  I haven't decided, but that's the

4    issue.

5            MR. DIAMOND:  Let me suggest one other thing and I

6    mentioned it to the Court last time and I went ahead and

7    researched it after, and that is a corporate surety.  Mr.

8    Fischbach is in the insurance business and we can arrange for

9    a corporate surety and we -- and I know the Court --

10           THE COURT:  I'll tell you why that doesn't move me

11   that much.  You could educate me on it and maybe it would move

12   me more, but, as I understand it, what it would mean is a

13   third party comes in and posts some substantial amount of

14   money, cash for the Court, and then if Mr. Lustgarten runs,

15   which is the risk, all right, then if he runs, the Court gets

16   the money.  Well, that's nice, but, really, from the Court's

17   perspective, I'm more interested in having Mr. Lustgarten here

18   for trial than I am in getting the taxpayers one million or

19   whatever they post.  So, maybe they'll go after it like the

20   bounty hunter movies.

21           MR. DIAMOND:  They do.

22           THE COURT:  They will go track him down and find him,

23   but there are already people who work for the government right

24   here who track people down and find people and they seem to

25   find just about everybody.  It takes a while once --

1    occasionally, but they find them, and I think that -- I infer

2    and presume in every case, including Mr. Lustgarten's, that if

3    he were released, he understands that if he were to run, the

4    marshals will put him on a list and they will track them down

5    and they will go to Venezuela if they have to go to Venezuela

6    and they will go to California if they find him on a beach in

7    California and they will go to wherever they have to go and do

8    whatever they have to do to eventually find him.

9         So, the corporate surety, presumably, will do

10   something like that, but I don't know what more inducement

11   that creates in his mind to stay.

12        MR. DIAMOND:  The only reason I say that is because

13   it is -- I know the Court found it unusual and not common, and

14   I understand, because that's why I say I researched it.  Mr.

15   Mullane practices here in Boston and he said that in the state

16   courts they don't use that as a type of situation.  In south

17   Florida they do and they go to it for this type of situation,

18   and that's the reason I say it, and then when I heard from Mr.

19   Mullane that they didn't use it in the state court, I went

20   ahead and contacted someone that I know and they do post in

21   the federal courts.  The surety companies are, in fact,

22   national companies --

23        THE COURT:  It may be permissible.  I'm more

24   wondering -- the question I have about it is why would -- if

25   he's -- what does the surety's willingness to send a bounty

1    hunter do to make it more likely that he would stay in this

2    mix?  That's what I'm thinking about and I don't see why --

3            MR. DIAMOND:  And I appreciate that.  In fact,

4    oftentimes I don't like that because to me it's just wasted

5    money, but if there's any way to make this --

6            THE COURT:  I'll tell you what I think about in every

7    case.

8            MR. DIAMOND:  Yes.

9            THE COURT:  I think about whether there are reasons

10   to detain somebody.  That is, reasons that create risk of

11   flight, as here.  I think about what would there be that if it

12   were a condition, that if the person -- if I were to release

13   the person and I impose that condition, it would make it very

14   painful or difficult for them to run and that that would hold

15   them.

16           So, for example, sometimes you could have a young man

17   who lives with -- who might live with his grandmother and his

18   grandmother might have a modest home worth way less than the

19   -- than homes on Turnberry Isle, but it's the only home that

20   she's ever owned and she's now retired and if she -- it's the

21   only significant asset that she's accumulated in her life and

22   she's a very important figure in that young man's life and

23   though there might be reasons to detain him, if I release him

24   on the grandmother posting a house and him living with the

25   grandmother and if he understands, as he would before he's

1    released, that if he leaves, she's homeless, he likely won't

2    leave, not -- because of the pain that it will cause him and

3    the pain it will cause his grandmother.

4         So, the concern I have here -- and I understand

5    factually you're telling me that these aren't the facts, but I

6    don't know that I can find that on this record.  The concern I

7    have is that with the -- what I have here is that while I --

8    that it's significant to these people, what they're posting.

9    The concern related to the risk of flight is the concern that

10   he might have access to funds to make it good.

11        So that the sort of risk factor is a big Guideline

12   sentence, serious case, never been to jail before.  If he gets

13   convicted, he's exposed under the Sentencing Guidelines to a

14   very lengthy sentence.  A person with substantial ties outside

15   the United States, hasn't lived here that long, and access to

16   -- potentially access to a lot of money creates that risk of

17   flight.

18        So, I'm thinking about what would there be that might

19   hold him.  That's the concern I have about what you're

20   offering.  I'm not saying it's a bad offer.  I understand why

21   you've offered what you offered.  I'm wrestling in my mind

22   whether that's enough to reasonably assure his appearance.  I

23   don't have a -- if there were a particular condition in my

24   mind...

25             (Discussion off the record.)

1    MR. DIAMOND:  Your Honor, there was discussion at

2  some point.  He would offer up passports of family members,

3  the daughters.  They are here.  They were -- they come to the

4  Boston area.  One of them went to Boston University.  One of

5  them went to --

6    THE DEFENDANT:  Bentley.

7    MR. DIAMOND:  Bentley.  I'm sorry.

8    THE DEFENDANT:  One is going to --

9    MR. DIAMOND:  Yes.  One is going to Bentley now.

10    We'll do everything that we can.  Mr. Lustgarten

11  wants to see this through and, more interestingly -- and I

12  don't know if I finished on this, but, again, if they can

13  proffer, I can proffer.

14    There is a separate prosecution and I'm waiting --

15  and, again, this is the most troublesome -- this is another

16  troublesome part of this prosecution, but I think there's

17  exculpatory evidence from others who will say the exact

18  opposite of what was proffered here, others who were accused,

19  others who can benefit from turning the tables and saying, no,

20  it was Martin, but I have it upon information and belief, and

21  I believe that there is *Brady* out there where they say Martin

22  had no knowledge, had no participation.

23    THE COURT:  And these are people who say, I was a

24  drug dealer, but he had no idea I was a drug dealer?

25    MR. DIAMOND:  I knew what these transactions were

1    about.  Yet, Martin didn't.  He thought these were contract-

2    based --

3            THE COURT:  In other words, we lied to him?

4            MR. DIAMOND:  We kept it all from him, absolutely,

5    and that's what I say when I see this transcript, they're

6    telling it to him.  That's what's --

7            THE COURT:  That's risky.

8            MR. DIAMOND:  I'm sorry?

9            THE COURT:  That's risky.

10           MR. DIAMOND:  I appreciate it's risky, but the bottom

11   line is they have already undertaken a course of conduct and

12   my understanding is that that is information that's in the

13   hands of the government.

14           Again, Monday goes by.  I have to wait until

15   Thursday.  Now I'm just asking for a cutoff date for

16   discovery --

17           THE COURT:  We'll come back to that.

18           Let me just ask the government one question first

19   just with respect to the bail question, not the *Brady*

20   discovery issue.

21           It is an unusual case where the defendant is being

22   prosecuted and the prosecution encompasses, in part, the

23   period of time in which he was a source of information for the

24   government about the very topic about which he's being

25   prosecuted.

1          MR. PALAZZO:  Yes, your Honor.  In fact, the

2     obstruction charges relate to lies from the defendant during

3     that time period, including the very --

4          THE COURT:  Obstruction doesn't seem as unusual as

5     the underlying prosecution.

6          MR. PALAZZO:  But that includes the very affidavit

7     that my brother referred to settling a separate matter in

8     2010.  One of our obstruction charges relates to him

9     specifically lying in that document about financial dealings.

10    So, it's sort of ironic today that he's asking the Court to

11    rely on that to say he's not a risk of flight.

12         THE COURT:  Quick question for you, Mr. Diamond, just

13    on bail conditions.  I don't know if they do this in Florida.

14    I've never seen it done in Massachusetts, but since so much

15    money went through your client's accounts, I figured I would

16    ask.

17         I have heard that there are some federal courts, I

18    think the Southern District, where people have been released

19    on the condition that they retain -- on the proffer, not

20    corporate sureties, but that their security firm, typically

21    retired federal agents, will essentially imprison the person

22    at home and the person will hire the security firm to have

23    guards at the person's home to enforce the home detention.

24         I've not -- I've never -- I'll be frank with both of

25    you.  I've never seen it proposed in a case.  I have heard

1  that it was done.  I'm aware that it was done in some cases in
2  the Southern District.  I didn't -- but since so much money
3  went through your client's hands, then that gives me pause on
4  the -- on whether the proffer that you make is sufficient to
5  overcome.  I thought I would ask about that because that does
6  seem -- I'm not saying that's sufficient, but it's of a
7  different character.

8        MR. DIAMOND:  I haven't heard of it being done.  I've
9  asked Mr. Lustgarten.  I certainly would make inquiry on it
10  and do everything that we can do to get that done, and he says
11  this for the reasons that I have advised this Court.

12        I've never seen anything like these conditions that
13  he is being held under, making it virtually impossible to
14  receive any meaningful Sixth Amendment assistance.  So, we can
15  do that.  I also asked the Fischbachs and they are prepared to
16  give up their passports as well.

17        THE COURT:  So, why don't you -- if there's any
18  supplemental -- I'm going to take this under advisement.  If
19  there's any supplemental conditions -- you don't have to write
20  that they'll post their passports.  We all know that and I've
21  heard that, but if there's anything -- if, for example, this
22  -- you want to propose that you're going to hire guards and
23  some firm, then you would say this is the firm we hire and
24  this is how it would work and this is what it would be so that
25  I would know what exactly you're proposing.

1          When would you want to supplement with that?  How
2     much time would you want to supplement that?
3          MR. DIAMOND:  Your Honor, if I can get this done, I
4     will -- I'll get my office working on it, my assistant working
5     on it.
6          THE COURT:  I'll tell you what.  You can supplement
7     whenever.  I won't do anything until -- for a week.  If you
8     submit it before then, I'll look at it before then, but at the
9     end of the week, I'm going to resolve this if I haven't heard
10    from you.
11         MR. DIAMOND:  I appreciate that.  What I'm trying to
12    say is --
13         THE COURT:  Unless you tell me you want more time
14    within that week.
15         MR. DIAMOND:  I'm advising the Court I'm going to get
16    on it as soon as I walk out of this courtroom.
17         THE COURT:  If he files something that supplements --
18    that proposes either the condition I just threw out or some
19    other supplemental conditions, then if you want to respond to
20    that, you may.
21         What you should do -- I won't immediately rule.  If I
22    don't hear from anybody in seven days, then I'm going to
23    decide.  All right?  But if he files a supplement in that time
24    period and proposes -- I'm not looking for a long briefing.
25    I'm just looking for additional conditions, whatever they

1    might be, that you would offer and describe what the

2    conditions are.

3         MR. DIAMOND:  If I can just share with the Court what

4    I'm thinking so I'm on the same page, and that is I would

5    reach out to -- I do know some former United States Marshals

6    that are -- or may be able to put me in the direction of

7    private security firms that would do that and I will see

8    what--

9         THE COURT:  To be honest, to be forthright with both

10   of you, it's something I would weigh seriously.  What I know

11   about only is that I know from media reports that in the

12   Southern District it's been done in a couple of cases where

13   FBI agents or retired U.S. Marshals, through a security firm

14   or retained, and provided 24/7 guards at somebody's home to

15   enforce a home detention order.  I'm not saying that that

16   means I would release the defendant, but I certainly think

17   that would be a condition that would be a stronger --

18   supplementing the conditions that are offered, would be a

19   stronger condition and I would weigh the appeal more

20   seriously.

21        I'm not -- if there are no conditions beyond what's

22   already been offered, I'm going to think about it, but I tell

23   you both I'm not likely to on the present set of conditions

24   release Mr. Lustgarten.  I got to think about it, but for the

25   reasons that we -- I've previewed for you.

1    I'm not saying if that were proposed, I would release

2    him, but it certainly would be a further stronger condition,

3    because the risk here is flight and that seems to be a

4    condition that starts addressing directly the flight that

5    isn't answered by -- that having $100 million in Venezuela or

6    having -- what have you.

7    But if he proposes supplemental conditions, if you

8    want to respond to that, you may, and what I would say -- tell

9    you to do then is when he files it, within -- by the close of

10   business the next day, tell Ms. Simeone that you want to

11   respond and -- you don't have to necessarily respond in 24

12   hours, but if you don't want to respond, just tell her, We

13   don't want to respond, and then I'll proceed to evaluate and

14   decide.  If you want to respond, then you should respond

15   promptly, but I'm not going to say how fast because a little

16   bit depends on what the conditions are.

17   If he proposes his daughters' passports, you ought to

18   respond to that, if you're going even to write anything,

19   within one to two days.  On the other hand, if he proposes

20   something more complicated, you might need more time.

21   So, tell Ms. Simeone how long you want to respond or

22   file a one- or two-sentence motion that says, Judge, we would

23   like this long to respond to his proposed conditions, and I'll

24   either agree to that amount of time or I'll say how much time

25   I'll give you, but I won't rule until you file something.

1       MR. PALAZZO:  Yes, your Honor.  In anticipation of an

2  appeal, there's a few more things the government would like to

3  get on the record with the Court, and they are all related to

4  risk of flight.

5       THE COURT:  Okay.

6       MR. PALAZZO:  I'm not going to address the other

7  points, but the government does take issue with the accusation

8  of lack of candor.  The government is transparent and will

9  continue to be to this Court and to the defendant.

10      The exhibit, No. 4, that we marked earlier today, if

11  I could just draw your attention to it --

12      THE COURT:  Hold on.  I just want to...

13      (Pause.)

14      THE COURT:  Exhibit 4 is -- that's the call No. 258

15  in the lower right corner of the first page?

16      MR. PALAZZO:  Yes, your Honor.

17      THE COURT:  All right.  You want to call my attention

18  to -- I have an arrow -- I have an arrow on Page 1 next to

19  "Lustgarten" that somebody hand wrote in.

20      MR. PALAZZO:  Oh, you must have gotten my copy.

21      THE COURT:  You want your copy back?

22      MR. PALAZZO:  Yes, your Honor.  Well, I've marked

23  this one, too.

24      THE COURT:  All right.  I'll take this --

25      MR. DIAMOND:  Here's a clean one.

1        MR. PALAZZO:  I would like to move to Page 3 and --

2        THE COURT:  Do you care that I have these arrows?

3        MR. DIAMOND:  No.

4        THE COURT:  All right.

5        MR. PALAZZO:  The arrow was just to skip over the

6   greetings between the two.

7        THE COURT:  So, Page 3.

8        MR. PALAZZO:  Yeah.  Towards the bottom there begins

9   a discussion where Salomon Bendayan asks the co-defendant,

10  "How did things go with Raphael, Martin?"

11       They then go on to discuss Raphael Junior, Christian

12  Sung (phonetic), and then go on to talk about some

13  transactions that Mr. Lustgarten is handling for those people.

14       That Raphael and those two Sungs, the government has

15  information that it's going to put forth at trial are

16  well-known professional money launderers who work very closely

17  with a revolutionary militant group in eastern Columbia and

18  that's been committed to overthrowing the government down

19  there and controls territory down there.  So, that's who we're

20  talking about here today.

21       You were correct to point out this is an unusual

22  case, your Honor.  So, when it comes to risk of flight, not

23  only does the United States lack an extradition treaty with

24  Venezuela where the defendant is a citizen and has business

25  ties, he also has ties to this military group that could very

1   easily protect him for many years to come.  He is someone

2   that's involved in moving their money, your Honor.  If there

3   was ever a safe place in the entire globe for him to go, it

4   would be to this territory controlled --

5           THE COURT:  Wouldn't he, as a practical matter -- why

6   would they want to help him?  I mean, the only reason they

7   could conceivably want to help him now was if they thought he

8   was going to do worse -- do more damage to them.  So, they

9   might, in theory, want to take him out of the clutches, so to

10  speak, of the United States, where he couldn't harm -- would

11  no longer be a potential witness for them, but, as a practical

12  matter, would he do that?  I mean, they would know he's been a

13  source of information.  Wouldn't they just --

14          MR. PALAZZO:  Well, part of the problem is he has not

15  informed on this group to the government.  He has very happily

16  done business with this Raphael and Raphael's network.  And

17  that brings me to the second point --

18          THE COURT:  That's not -- that might warm their

19  hearts a little bit, that he didn't inform on them, but having

20  informed on others, he's gone down a road that they might not

21  like.

22          MR. PALAZZO:  Well, he's one of their money guys,

23  your Honor.  The organization feeds off of drug proceeds and

24  other profits that they take and if they have someone with the

25  know-how and international network, he can simply go back to

1  work.

2  But that brings us to his assets, your Honor.

3  Exhibit No. 1 that's attached to the papers talks about --

4  THE COURT:  To which papers, your papers?

5  MR. PALAZZO:  Yes, your Honor.  I probably have

6  another copy --

7  THE COURT:  I have a copy.

8  MR. DIAMOND:  I'll take that copy.

9  THE COURT:  Yes.

10  MR. PALAZZO:  I apologize, your Honor.

11  It's a four-year time period where we were able to

12  map out these transactions.  That's what the exhibit shows.

13  Those four years show $546 million passing through those

14  accounts.  That's simply a four-year period in the conspiracy.

15  That is not in any way an exhaustive list of the assets that

16  he --

17  THE COURT:  Is there any double counting in that $546

18  million?  In other words, if a million dollars went from

19  account A to B to C to D and ends up in Venezuela, does that

20  count as a million dollars or does that count as, if there

21  were five transactions, $5 million?  Do you see what I'm

22  saying?

23  MR. PALAZZO:  Yes.  And I don't know if I can answer

24  that confidently.  So, I won't try to.  It's possible, your

25  Honor.  It's certainly possible.

1        THE COURT:  All right.

2        MR. PALAZZO:  But the point is that in the past he's

3    been asked what his assets are and he's lied about it.

4        We've done our best, indeed, to locate and, for lack

5    of a better word, freeze assets that we can locate, but he hid

6    money and moved money for a living, your Honor, for many

7    years.  I don't think it's very reasonable and I don't think

8    there are any conditions --

9        THE COURT:  Well, suppose he came back and said that

10   he hired XYZ Security, proposes hiring XYY Security Firm,

11   which is a reputable security firm which does various security

12   services for private businesses, and one of the services they

13   offer is the -- they will provide armed guards, people who are

14   former FBI agents, DEA agents, U.S. Marshals retired, and he's

15   proposed that he hires them to provide round-the-clock

16   security imprisonment in his home.  So, he's on the bracelet

17   at home, and they'll be there and they will enforce the

18   Court's order.  They won't let him out.  And if he had

19   permission to go to his lawyer's office, he would travel with

20   these guards and he's in their custody, to his lawyer's office

21   and then back, and -- you know, on some set of conditions, not

22   out of sight, or what have you.  Let's just suppose.  What

23   would you think of that?

24       MR. PALAZZO:  I think someone of the resources of Mr.

25   Lustgarten -- that's where I was going with that.  We don't

1    know all his resources.  Even since the first detention

2    hearing in Florida, we learned of other accounts that he --

3              THE COURT:  But, say, he had $100 million in bank

4    accounts that you don't know about overseas that he could

5    access.  How would that facilitate flight in the face of that

6    condition?

7              MR. PALAZZO:  Well, we're talking about a security

8    firm that is going to be paid by the defendant; is that right?

9              THE COURT:  Presumably.  I'm not paying for it.

10             MR. PALAZZO:  Neither is the government.  Neither is

11   the government, your Honor.

12             So, I would put forth that there's no amount of money

13   in the world that this defendant, who is facing 20 years in

14   prison, would not be willing to secure.

15             THE COURT:  The risk there would be that given -- if

16   he has access to funds, the risk is that he could essentially

17   pay the individual company employees to look the other way and

18   let him go or he can pay the company itself off?

19             MR. PALAZZO:  Absolutely, your Honor.  And this is

20   also a defendant who has lied to special agents of the DEA and

21   Homeland Security who have sat across the table from him.

22   He's looked into their eyes and specifically misled them and

23   made false statements.  There's no reason he wouldn't do that

24   to that private security company.  There's no reason he

25   couldn't do that to this Court again.

1          THE COURT:  Right.  I guess the question is whether

2     the nature of the company was such that they -- I think Bernie

3     Madoff was released on that kind of condition and when he was

4     -- he was on release, Mr. Madoff, at least according to the

5     New York Times, for a period of time before his bail was

6     revoked and I believe that there was a security firm that

7     provided 24/7 agents, imprisoned in his home.

8          MR. PALAZZO:  I'm sure part of that was the notoriety

9     of Mr. Madoff prior to --

10          THE COURT:  I only point that out -- I mean, that's

11     where I heard about it.  I think there are a couple of cases

12     in the Southern District, but -- so, your concern about that

13     would be, essentially, the risk that they wouldn't be -- the

14     company wouldn't honor its obligation to the Court to enforce

15     the Court's order, that he would -- essentially, could corrupt

16     that in some way.

17          MR. PALAZZO:  Yes, your Honor.

18          THE COURT:  All right.  Well, we'll see.  He hasn't

19     proposed it and I haven't even -- even if he does propose it,

20     I don't know what I would think of it, but I'll think about

21     that.  All right.

22          MR. DIAMOND:  If I can just --

23          THE COURT:  Anything else on the bail question?

24          MR. DIAMOND:  If I can just respond briefly, because

25     of the -- again, what I consider to be fantasy, absolute

1  fantasy.

2        There were no accounts in Columbia, never were

3  accounts in Columbia, ever.  Yet, they come into a courtroom

4  on a proffer without an agent, without an analyst, without

5  anybody, and say he has accounts in Columbia.  There were

6  none, ever.

7        Then they come in and say all of these words that get

8  people's hackles up:  Drugs.  The agent themselves say no

9  drugs.  Then they come up with this other fellow, Raphael

10  Farque (phonetic).  I mean, you know, it's just fantasy.  In

11  fact, he tells the agents -- he tells the people, I'm not

12  doing anything with Raphael.  I want nothing to do with

13  Raphael.  It's in the papers.  It's in their 18 documents, but

14  this is what I keep getting every time I walk into a

15  courtroom, a new fantasy.

16        He's going to pay off -- whether it's Brinks or

17  somebody like that, they're going to take his money to walk

18  out the door?  Please.  It gets ridiculous.  It gets

19  increasingly ridiculous, and there has to be an end to it.

20        THE COURT:  We don't have to cross the bridge whether

21  there's a risk that he would pay off Brinks because you

22  haven't yet --

23        MR. DIAMOND:  I appreciate that.

24        I'm just simply saying, clearly, we would go to -- if

25  we're going to do this -- and I'm certainly going to make that

1    effort -- we're going to go to the most reputable company we

2    can go to.

3            THE COURT:  Okay.  All right.

4            MS. FERGUSON:  Your Honor, may I just --

5            THE COURT:  Yes.

6            MS. FERGUSON:  Just to close our part.

7            Just sort of touched off by what the defendant just

8    said.  You know, this misrepresentation or recasting of the

9    facts has been sort of a thread that has woven its way through

10    these detention proceedings from the very beginning until now,

11    just at the very end of what we have heard.

12            I mean, we have, as Mr. Palazzo said, the reliance on

13    an affidavit that forms part of the basis of the obstruction

14    count because of his misrepresentations.  We have the accounts

15    that were not reported to Pretrial Services in Florida.  In

16    here there is mention of, you know, one bank account with

17    $20,000 in it, and after the fact he directs his wife and his

18    associate to try to drain several bank accounts of hundreds of

19    thousands of dollars.  We're notified by the banks about that.

20    We don't know about those accounts ahead of time.  So, he's

21    dishonest about his assets with Pretrial Services and the

22    court in Florida.

23            There's -- at the detention hearing before Magistrate

24    Judge Dein we introduced the exhibits showing the money moving

25    through his accounts.  He says, Those aren't my accounts.

1    Those aren't my accounts.  And then not two minutes later, he

2    says, Well, yes, their my accounts, but the money was clean.

3          Talking today about his ties to Venezuela, the fact

4    that he has absolutely no ties to Venezuela.  He has no

5    ties -- no reason that he would ever have anything to do with

6    Venezuela.  As the Court pointed out, that's just not true.

7    It's just a complete recasting of what is, in fact, the truth.

8          And, finally, your Honor, this hammering on this

9    grand jury transcript over and over and over again, completing

10   misrepresenting to the Court what the transcript, in fact,

11   says and what the agent testified to in grand jury over and

12   over and over again.

13         And I have seen the Court's reaction to that, but I

14   just note it for the record, that this -- if we're talking

15   about --

16         THE COURT:  I read the excerpt from the grand jury

17   transcript that was submitted.

18         MR. DIAMOND:  It is what it is.

19         MS. FERGUSON:  It is what it is, is exactly right,

20   and I --

21         THE COURT:  I think we would all agree with that.

22         MS. FERGUSON:  I would represent it is not what the

23   defendant has represented it to be.

24         That having been said, part of this issue about risk

25   of flight turns on, you know, whether we can trust what the

1    defendant says about his access to resources, whether we can

2    trust him to abide by --

3         THE COURT:  I'm unlikely -- if it's unclear, I'm

4    unlikely to release the defendant on the notion that he has

5    nothing left after the freeze order and, therefore, one point

6    whatever million is sufficient security.  I'm not saying that

7    I'm ruling that, but I'm not likely to do that.  I don't know

8    -- a bail hearing is a preliminary hearing.  It is not trial

9    on the merits, and I'm not in the position to make a -- the

10   evidence is not sufficient before me and the amount of

11   evidentiary hearings that we require to determine that would

12   be equivalent to a trial, to make a determination as to

13   whether, in fact, everything that Mr. Lustgarten has has been

14   reached by the government.  And so -- and I'm not going down

15   that road and neither of you are really asking me to go down

16   that kind of road in terms of a hearing.

17        So, I am thinking about this.  It is a --

18   nonetheless, you have substantial things in your favor that I

19   outlined.  On the other hand, he's a guy before the Court with

20   no criminal record, who has been in the United States, who met

21   with the agents, who appeared, it seems, when the agents

22   wanted to talk to him.  Certainly during the times he was the

23   source of information he appeared and met with them and told

24   them.  It might have been untrue.  It might not.  That's a

25   matter for trial.  There's probable cause to believe he told

1   them obstructive things, made statements or committed

2   obstruction.  He at least sometimes met with them and other

3   times -- it doesn't make him automatically subject to release,

4   but there are a lot of things that -- you know, that are in

5   his favor.  He has a lot of things that look -- and he has a

6   lot of people in the community, albeit some relatively

7   recently in the community of the United States who are willing

8   to support him.  So, it doesn't -- there's things to consider.

9        I'm not making a determination based on lack of

10   candor or misconduct or misrepresentation.  It seems to me

11   that this is a bail question that turns just on what's the

12   evidence, what's the law, what's the argument.  Either there's

13   clearly risk of flight, either the proffer is enough, proffer

14   conditions, or it isn't, like every other release case.

15        If there's a question -- I'm not inviting this, but

16   detention hearings are to decide whether people are released

17   or detained.  Sanction motions are to decide whether

18   sanctions.  I'm not saying that you've done anything that's

19   sanctionable.  I mean, at least I don't want to imply that.

20   I'm just -- given the statements -- and I understand why

21   people are concerned when statements like that are made.  I'm

22   not -- that's not part of the -- if I think there was

23   something that should be turned over that's material to the

24   release or detention, I'm going to order you to turn it over

25   and we'll decide release or detention on the merits.  So,

1    that's my perspective as applied to this particular motion.

2         So, I will take it under advisement.  If I don't hear

3    from you in a week, then I'm just going to decide it.  If you

4    file a supplement within 24 hours, tell Ms. Simeone whether

5    you want -- file something that says, We don't want to

6    respond.  We rest on the papers, or we want this long to

7    respond, and then I'll -- the motion for however long you want

8    and then I'll respond to that.

9         The second issue is, in terms of the status of the

10   case, you have a further hearing before -- do you have a

11   further hearing before Judge Dein at the end of the month?

12        MS. FERGUSON:  Yes, your Honor.

13        MR. DIAMOND:  Yes.

14        THE COURT:  What is the -- and at that point you're

15   going to sort of update her on the state of discovery and

16   where things are.

17        I know you both addressed the question of a trial.  I

18   think that I want to wait to address that question before --

19   to resolve the detention issue.  I think that if -- on

20   deciding the question of release or detention, without regard

21   to when the trial should occur, but if Mr. Lustgarten is

22   detained, then, obviously, the trial comes at a faster pace

23   because, first of all, all our rules tell us that we give

24   priority to people in custody over people who are not in

25   custody.  It's, obviously, more significant because he's

1  presumed innocent and he would be in custody.  I would imagine

2  that all of you would prefer a more leisurely pace that might

3  apply if he were on release, even if you don't want him

4  released.  If he were released, it would make sense that you

5  might not need to go as quickly, but I don't think I can make

6  that decision -- I'll decide that once I decide the release or

7  detention question and then I'll probably want to talk to you

8  again or ask for an update or maybe after you see Judge Dein

9  and maybe before and then ask you for a status report and then

10  see you again, I'll see, but I'll hear from you again about

11  where things are in terms of discovery and the preparation,

12  and then you'll know what you're looking at in terms of

13  detention or release to -- from your position, but in terms of

14  the July 6th date -- you were anticipating something on July

15  6th, but I can't remember now what it was.

16      MS. FERGUSON:  Your Honor had -- so, Judge Dein had

17  ordered, I believe, that by July 6th they should indicate if

18  they wanted more discovery, maybe by July 2nd.  I don't have

19  the dates exactly in my head, but they had indicated that they

20  did, in fact, want more discovery.

21      We had spoken -- the last time we were before your

22  Honor, I believe you had inquired whether we would be able to

23  get together all of the remaining domestic discovery by July

24  6th.  We indicated that we thought we would be able to.

25  Because of the holiday, it did not go on July 6th.  Some

1   people were out of the office that we were collecting

2   materials from.  However, they did send an additional

3   production yesterday.  We sent it by FedEx.

4          I additionally emailed certain documents that I

5   thought were responsive to an email that got sent to us.  Your

6   Honor has it attached as an exhibit that they submitted to you

7   today.

8          I would note that several of the documents that I

9   sent last night and that they have submitted to your Honor

10   were documents that they had already and we produced them an

11   additional time.  We sent --

12          THE COURT:  What do you think you have left to

13   produce?

14          MS. FERGUSON:  So, we are awaiting one set of notes,

15   your Honor, from an agent, who -- I expect to get those today.

16          THE COURT:  Notes from one particular --

17          MS. FERGUSON:  That's from a particular agent, from a

18   particular meeting.  Those are not part of automatic

19   discovery, but we are turning it over --

20          THE COURT:  One set of notes as to one meeting, you

21   want to be able to turn them over?

22          MS. FERGUSON:  We would like to turn those over.

23          The international materials, MLAT materials, I sort

24   of put those to the side.  That's another animal.  We have

25   provided reports from Homeland Security Investigations from

1     agents who are in Argentina and Brazil.

2           THE COURT:  I'm only interested in what you think you

3     have left.

4           MS. FERGUSON:  I understand that.  I'm sorry.

5           I am still awaiting the arrival of reports from DEA

6     agents who are in Columbia.  Those have been requested.

7           THE COURT:  So, some DEA agent, Columbia reports.

8           MS. FERGUSON:  Yes.

9           THE COURT:  One, notes of a meeting.

10           MS. FERGUSON:  Yes.

11           THE COURT:  And --

12           MS. FERGUSON:  There are certain documents from Mr.

13     Lustgarten's CS file that were requested that -- it had to go

14     to D.C. to get approval.

15           THE COURT:  Going through the process.  You're

16     waiting to --

17           MS. FERGUSON:  Waiting to be able to turn those over

18     or to be able to turn over a summary of what's contained

19     therein.

20           THE COURT:  All right.

21           MS. FERGUSON:  And then there are certain domestic

22     DEA reports that we have received that -- they are from other

23     jurisdictions, not our investigative team, and we are

24     reviewing those to determine whether, in fact, they have any

25     relevance here and if -- if they are relevant, we will turn

1  them over, but they are, as I say, from the other

2  investigations and --

3        THE COURT:  So, you're -- other than MLAT, you're

4  pretty close to being done from what you think you need to

5  turn over?

6        MS. FERGUSON:  Yes.

7        THE COURT:  Now, in terms of the MLAT, do you think

8  you'll have that all by August 31st?

9        MS. FERGUSON:  No, I don't think so, but we'll

10  have -- you know, we'll have --

11        THE COURT:  Are you willing to go forward without it?

12        MS. FERGUSON:  Well, I think at the last hearing we

13  had said that we thought a trial date in December was more

14  appropriate than a trial date -- I believe they requested in

15  August.  Your Honor had mentioned August.  That's not

16  possible.  So, we would rather not go forward without it.

17        THE COURT:  You're hoping for December because in

18  December you think you might have it and you can --

19        MS. FERGUSON:  More likely.  More likely.

20        THE COURT:  Okay.  All right.

21        I'm not doing anything else until I have an update on

22  where that is.  There are no other motions pending.

23  Therefore, I'm not going to address the question of what date

24  the case should go to trial until after I resolve the question

25  of release or retention.

1      MR. DIAMOND:  So, if I'm hearing what the prosecutors

2   are saying, they have provided what they believe is their

3   obligation under what they believe they're supposed to give us

4   under the automatic discovery.  Is that -- again, I wasn't

5   sure what I heard.

6      THE COURT:  This is where I think things are on

7   discovery from my understanding.  The government has said, as

8   I understood in a general way what Ms. Ferguson has said, that

9   she has said that there's a series of a -- groups of

10  information that the government is turning over, not all of

11  which the government would agree qualifies as automatic

12  discovery, but all of it is information they wish to turn over

13  at this stage of the case, that they have done all of that,

14  except, by in large, the things that she enumerated in the

15  list.  That might not be an exhaustive conclusive list, but

16  it's, by in large, the material major things, if not all of

17  it, and that she anticipates that in terms of -- other than

18  the MLAT materials, everything else, they'll be done with that

19  pretty soon.

20      And in terms of the discovery, it's still pending

21  before Judge Dein, the case proceeding on the schedule that

22  she has established or further will establish.

23      If you want further discovery, there's -- then, in

24  addition, there'll be two other things beyond what she

25  described.  There'll be the MLAT discovery, when and if it

1    comes.  There'll be the automatic -- the so-called 21-day

2    discovery, the information under the local rules, that would

3    come then.

4            And, third, there would be any other discovery that

5    you seek that either they agree to give you or that you seek,

6    they don't agree, and that Judge Dein, or if not Judge Dein, I

7    order them to give you.  So, if you want that -- ordinarily I

8    imagine what Judge Dein is going to do, if she hasn't already

9    done it, is to say by a certain date you have to file -- if

10   you're going to file a motion for discovery, you got to do it

11   by a certain date.  You got to request it first and document

12   it.  And so, I don't know if she set that date yet or not.

13           MR. DIAMOND:  I understand.  That's why I'm asking,

14   because I thought the deadline for the automatic discovery was

15   July 6th, and then, as I said, last night I'm driving from

16   Wyatt and I'm driving into Boston and --

17           THE COURT:  You'd have to look at the docket.  I

18   didn't look at that question before I came out.  It may or may

19   not be that she established July 6th as the date for automatic

20   discovery, but then the question is, is what they gave you

21   automatic discovery or additional information that they gave.

22           MR. DIAMOND:  I'll accept all additional.  I have no

23   problem with that.

24           THE COURT:  Right.  So, that's where it stands in

25   terms of going forward in terms of the schedule and what --

1  I'm going to leave it with Judge Dein, except that I'm going

2  to set -- I'm likely to set a trial date before I get the case

3  back from Judge Dein, which is different than -- because this

4  sounds like a -- because of the nature of the case and because

5  it might be a somewhat lengthy trial, it sounded like from

6  what you told me, and that becomes a little complicated to

7  schedule for all of us.  Better to schedule it earlier.  So,

8  you'll hear from me about that.

9          All right.  Thank you very much.  We're adjourned.

10  Thank you.

11          COURTROOM DEPUTY CLERK SIMEONE:  All rise.  This

12  matter is adjourned.

13          (Adjourned, 12:12 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 73, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of Criminal Action No.

7    15-10046-LTS, United States of America versus Martin Lustgarten

8    Acherman.

9

10
     July 22, 2015        /s/Catherine A. Handel
11   Date                 Catherine A. Handel, RPR-CM, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25